**The STATE of Ohio, Appellee,**

**v.**

**FROST, Appellant.**

[Cite as *State v. Frost,* 164 Ohio App.3d 61, 2005-Ohio-5510.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 20588.

Decided Oct. 14, 2005.

Mathias Heck, Montgomery County Prosecuting Attorney, and Jennifer D. Brumby, Assistant Prosecuting Attorney, for appellee.

Lucas W. Wilder, for appellant.

———————

WOLFF, Judge.

{¶ 1} Roger L. Frost, appellant, was found guilty by a jury in the Montgomery County Court of Common Pleas of aggravated robbery in violation of R.C. 2911.01(A)(1). He was sentenced to six years of incarceration. Frost appeals from his conviction.

{¶ 2} The state's evidence revealed the following facts.

{¶ 3} At approximately 6:50 p.m. on October 29, 2003, Isarel Holloway went to a Shell service station located at Free Pike and Gettysburg in Dayton, Ohio, after dropping off his wife and children at a nearby grocery store. Holloway prepaid $30 for the gasoline and returned to his vehicle. As he prepared to pump the fuel, he was grabbed from behind and spun around by Marvis A. Walton III and Frost. Walton hit Holloway in the head with a gun, demanded money, and then put the gun under Holloway's chin. At the same time, Frost went through Holloway's pockets. After removing approximately $115, Frost told Walton to kill Holloway and his dog, which was barking in Holloway's vehicle. Holloway responded that they had just taken everything he had, so why kill him? After a short pause, Walton and Frost ran to their car, a light blue four-door Buick Regal with a cloth top, and drove away. The car had bicentennial plates with a partial license plate number of 1, 5, and E. Holloway told the owner of the service station, Jafar Shaqra, that there had been a robbery, and Shaqra called the police.

{¶ 4} Dayton police officer Jennifer Florio responded first to the gas station. Officer Raymond Dine arrived shortly thereafter. After speaking with Holloway, Florio put out a broadcast for the suspects and the suspects' vehicle. Holloway picked up his wife and children from the grocery store and went home.

{¶ 5} A couple of hours after the robbery, Shaqra was at a second Shell station located at Third Street and Gettysburg, which he also partially owned. While there, Shaqra noticed a Buick Regal that matched the description of the vehicle used by the robbers earlier that evening, and he called the police. Shaqra provided a complete license plate number for the vehicle.

{¶ 6} At 9:24 p.m., officers were dispatched to the Third Street Shell station. Dine, who was parked nearby, confirmed that the Buick was the car for which they had been looking. Dine called for backup and followed the vehicle from the Shell station. After being joined by another cruiser, Dine initiated a traffic stop.

Two additional cruisers arrived. The four men who were inside the Buick were ordered out of their vehicle and were placed in separate cruisers.

{¶ 7} Officer Florio, who had also arrived at the traffic stop, contacted Holloway and indicated that they had stopped a vehicle fitting the description that he had given and that there were four men inside. She asked Holloway to come to that location to see whether he could identify the individuals who had robbed him. Holloway drove to the location near the National Guard Armory, where the stop had been made. When Holloway arrived, he looked in the cruisers and identified Walton and Frost as the individuals who had robbed him. Holloway told the officers that he did not know the two other individuals, Marcus Kenzie and Antonio Payne. The four men were arrested.

{¶ 8} At trial, Frost and Walton presented alibi evidence indicating that they were not at the Free Pike and Gettysburg Shell station at the time of the robbery. According to Payne, Kenzie, Walton, and their friend Damon Priest, Kenzie and Priest had met Payne, Walton, and Frost at Colonel White High School at approximately 6:30 p.m. to attend a talent show that was being held at the school at 7:00 p.m. They stood in line, waiting for the doors to open. A student waiting in line in front of them was either intoxicated or high, and David Johnson, the special security police officer at the high school, denied him admission to the show. Noticing Walton, Frost, and their friends, Johnson told them that they could not come into the show either, because they were not students. The group stepped out of the line, talked to some girls in the parking lot, and then decided to go to Rooster's restaurant on Main Street. They left the school at approximately 6:55 p.m. Johnson likewise testified that Walton and Frost, whom he knew, had been at the school for the talent show and that he had denied them admission.

{¶ 9} Priest and Kenzie stopped at the BP gas station at Grand and Salem Avenues on their way to Rooster's; the other three drove directly to the restaurant. After smoking marijuana in the parking lot, the group went into the restaurant and stayed for approximately two hours. They testified that they watched basketball and, in particular, that Lebron James was playing his first regular season NBA game that night. (Detective Mark Bilinski testified on rebuttal that the game did not start until 10:30 p.m.) Priest allegedly left separately, and Kenzie, Walton, Frost, and Payne left in Payne's vehicle, a blue Buick Regal. Payne stopped for gas at the Shell station at Third and Gettysburg and was stopped by the police shortly after pulling out of the station.

{¶ 10} On November 18, 2003, Frost and Walton were indicted for aggravated robbery in violation of R.C. 2911.01(A)(1). On May 14, 2004, the state reindicted them for aggravated robbery with a firearm specification. On May 19, 2004, Frost filed a notice of alibi. After a trial in which Frost and Walton were tried

together, the jury convicted Frost and Walton of aggravated robbery and acquitted them of the firearm specification.

{¶ 11} Frost raises three assignments of error on appeal.

{¶ 12} "I. Whether there was sufficient evidence to convict Mr. Frost of aggravated robbery."

{¶ 13} "II. Whether Mr. Frost's conviction was against the manifest weight of evidence."

{¶ 14} In his first and second assignments of error, Frost claims that his conviction was based on insufficient evidence and was against the manifest weight of the evidence. Due to the interrelatedness of these assignments of error, they will be treated together.

{¶ 15} " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed.1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime to be proven beyond a reasonable doubt. *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.

{¶ 16} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be

reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin,* 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 17} Frost claims that there was insufficient evidence to convict him of aggravated robbery. He states that although there was evidence that he aided and abetted in the robbery by placing his hands in Holloway's pockets and instructing Walton to kill the victim, there was no evidence that he himself had a deadly weapon. Frost's argument is premised on the assumption that he was indicted and tried as a principal in the aggravated robbery and not as an aider and abetter.

{¶ 18} In the May 14, 2004 indictment, Frost was indicted for aggravated robbery with a firearm specification. The aggravated robbery statute, R.C. 2911.01(A)(1), provides: "No person, in attempting or committing a theft offense as defined in Section 2913.01(K) of the Revised Code, * * * shall do any of the following: (A) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it or use it." Part of the definition of a "theft offense" under R.C. 2913.01(K) includes complicity in committing any statutory theft offense.

{¶ 19} Recognizing that a separate complicity statute exists and that Frost was not charged under that statute, the trial court interpreted the indictment to mean that Frost was charged as a principal for aggravated robbery. This interpretation is contrary to the language of R.C. 2923.03, the complicity statute.

{¶ 20} R.C. 2923.03(F) provides: "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, *or in terms of the principal offense.*" (Emphasis added.) Thus, an unarmed accomplice in an aggravated robbery may be charged under R.C. 2911.01(A) and punished as if he were a principal. *State v. Chapman* (1986), 21 Ohio St.3d 41, 42, 21 OBR 327, 487 N.E.2d 566. In such a case, the actions of the principal are imputed to the accomplice, and the accomplice "may be found to have committed every element of the offense committed by the principal, including possession of the weapon." *State v. Letts* (June 22, 2001), Montgomery App. No. 15681, 2001 WL 699537.

{¶ 21} In the present case, the prosecutor was under no obligation to charge Frost under R.C 2923.03 as an aider and abetter. Rather, under R.C. 2923.03(F), Frost was properly charged as an aider and abetter in the aggravated robbery when he was indicted under R.C. 2911.01(A)(1).

{¶ 22} Because the May 2004 indictment for aggravated robbery encompassed a charge of aiding and abetting in the aggravated robbery, we have little difficulty in finding that the state presented sufficient evidence to support the

charge as alleged in the indictment. At trial, Holloway testified that as he prepared to pump the gasoline at the Shell station at Free Pike and Gettysburg, two men—whom he identified as Walton and Frost—grabbed him and spun him around. Holloway stated that Walton hit him with a gun, demanded money, and placed the weapon under his chin. Holloway further indicated that Frost went through his pockets, tore his pants, and took approximately $115 from him. Frost then told Walton to kill him and his dog. Holloway identified their vehicle as a light blue or lavender four-door Buick Regal with a cloth top and informed the police that the car had bicentennial plates with a partial license-plate number of 1, 5, and E. David Barnes, a teenager who approached the Shell station at the time of the robbery, also testified that he saw a light-blue Buick with a partial license-plate number of 1, 5, and E pull onto Gettysburg after the robbery. Barnes further testified that as he approached the station, he saw a man by the Buick talking on a cellular telephone that had a blue light.

{¶ 23} A vehicle matching the description given by Holloway and Barnes and with a license plate number of DL15ED was later stopped after leaving the Shell station at Gettysburg and Third Streets. Detective Mark Bilinski of the Dayton Police Department testified that he subsequently searched the Buick and found a cellular telephone in the glove compartment of the car. When turned on, the cell phone had a blue light. Bilinski testified that he learned that the cell phone belonged to Frost.

{¶ 24} In sum, upon review of the record, we find that the state provided sufficient evidence that Frost was an accomplice in the robbery of Holloway at the Shell station at Free Pike and Gettysburg. The state further provided sufficient evidence that Walton, the principal, had committed the robbery while armed with a deadly weapon, i.e., a gun, and that he had displayed, brandished, possessed, or used it. Such evidence is sufficient to support a conviction of Frost as an aider· and abetter for aggravated robbery under R.C. 2911.01(A)(1).

{¶ 25} Although the state met its obligation of providing sufficient evidence to support the indictment, we cannot ignore the fact that the trial court instructed the jury as though Frost had been a principal in the offense and did not provide the jury with an instruction on aiding and abetting, as apparently requested by the state. In other words, the jury was instructed that in order to convict Frost of aggravated robbery, Frost must have had a deadly weapon on or about his person or under his control and either displayed the weapon, brandished it, indicated that he possessed it, or used it.

{¶ 26} As argued by Frost, there is no evidence that Frost had a deadly weapon during the course of the robbery. Several police officers testified that Holloway identified Walton as the offender with the gun, and Holloway himself indicated that Walton had the weapon. Holloway testified that Frost had taken

money from his pocket and had directed Walton to shoot him. No weapon was found in the Buick, nor was the weapon recovered from any of the men in the vehicle. Accordingly, the record is devoid of any evidence to support the jury's apparent conclusion that Frost had displayed, brandished, possessed, or used a deadly weapon while committing a theft offense. Consequently, the jury's verdict—based on the defective jury instructions—is unsupported and must be reversed.

{¶ 27} Although Frost has sought reversal based on insufficient evidence to support the verdict, in our view, a reversal under the instant circumstances does not invoke the protections of the Double Jeopardy Clause. "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States* (1978), 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1. A reversal based on insufficient evidence presented by the government must be distinguished, however, from reversal due to trial error. As explained by the United States Supreme Court:

{¶ 28} "In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished. See Note, Double Jeopardy: A New Trial After Appellate Reversal for Insufficient Evidence, 31 U.Chi.L.Rev. 365, 370 (1964).

{¶ 29} "The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble. Moreover, such an appellate reversal means that the government's case was so lacking that it should not have even been submitted to the jury. Since we necessarily afford absolute finality to a jury's *verdict* of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty." (Emphasis in original.) *Burks*, 437 U.S. at 15–16, 98 S.Ct. 2141, 57 L.Ed.2d 1.

{¶ 30} In this case, the blame for the erroneous verdict cannot be placed at the feet of the prosecution. Frost was indicted under R.C. 2911.01(A)(1), an offense

for which an accomplice may be convicted and sentenced as if he were a principal. In its opening statement, the state expressly indicated that one defendant had a gun while the other did not; thus, the state apparently proceeded at trial under the theory that Frost, the defendant without the gun, was an accomplice to the aggravated robbery. As stated above, the state presented sufficient evidence to present the charge of aggravated robbery to the jury. In other words, the reversal of Frost's conviction is not a decision that the government has failed to prove its case. Rather, we conclude that the jury was improperly instructed and then improperly reached a verdict contrary to those instructions. Such errors amount to trial error for which double jeopardy does not attach.

{¶ 31} The first assignment of error is sustained.

{¶ 32} In light of our ruling on the first assignment of error, the second assignment of error is overruled as moot.

{¶ 33} "III. Whether the trial court erred in failing to give the jury instructions of Roger Frost's alibi."

{¶ 34} In his third assignment of error, Frost claims that the trial court erred when it failed to provide the jury with an alibi instruction.

{¶ 35} "The general rule in Ohio regarding special instructions in a criminal case is that if the requested instructions to the jury are correct, pertinent and timely presented, they must be included, at least in substance, in the general charge." *State v. Boulabeiz* (1994), 92 Ohio App.3d 238, 241, 634 N.E.2d 700; *State v. McCarthy* (1992), 65 Ohio St.3d 589, 593, 605 N.E.2d 911, citing *Cincinnati v. Epperson* (1969), 20 Ohio St.2d 59, 49 O.O.2d 342, 253 N.E.2d 785. Where a defendant files a timely notice of alibi, presents evidence to support the contention, and relies on alibi as his sole defense, the trial court has a statutory duty, pursuant to R.C. 2945.11, to charge the jury on alibi. *State v. McDade* (Jan. 11, 1995), Montgomery App. No. 14339, 1995 WL 9453. However, the trial court is not required to give such instruction in the exact form requested by the defendant and may, instead, frame the instructions in the court's own words. *State v. Sneed* (1992), 63 Ohio St.3d 3, 584 N.E.2d 1160; *State v. Haley* (July 25, 1997), Greene App. No. 96–CA–50, 1997 WL 435692. Likewise, a requested special instruction need not be given when the law it expresses is adequately presented by a general charge. Id.

{¶ 36} In the present case, Frost filed a timely notice of alibi and requested that an alibi instruction be provided to the jury. The trial court overruled the request, reasoning that an alibi is not an affirmative defense, that the prosecution must prove that the defendants committed the robbery beyond a reasonable doubt (i.e., that they were at the Shell station at Free Pike and Gettysburg), and that the alibi instruction was confusing. This was error.

{¶ 37} As stated above, Frost and Walton presented the testimonies of Payne, Kenzie, Priest, Walton, and Johnson, all of whom indicated that Frost and Walton were present at Colonel White High School at the time of the robbery. Although the failure to provide an alibi instruction would not rise to the level of plain error had the instruction not been requested, we cannot say that Frost was not prejudiced by the court's failure to give the requested instruction.

{¶ 38} The third assignment of error is sustained.

{¶ 39} The judgment of the trial court is reversed, and the cause is remanded for a new trial.

Judgment reversed<br>and cause remanded.

DONOVAN and YOUNG, JJ., concur.

FREDERICK N. YOUNG, J., retired, of the Second Appellate District, sitting by assignment.