OPINION
{¶ 1} Defendant-appellant Damian Brodie appeals from his convictions and sentence for Murder, Aggravated Robbery and Having a Weapon Under a Disability. Brodie contends that the State did not present evidence sufficient to support the Murder convictions and that those convictions are against the manifest weight of the evidence. He also contends that the trial court erred by failing to consider the lesser-included charge of Involuntary Manslaughter. Finally, Brodie claims that he was deprived of a fair trial due to prosecutorial misconduct.
 {¶ 2} We conclude that the State presented evidence to support the Murder convictions. We further conclude that the trial court did not err by rejecting Brodie's argument regarding Involuntary Manslaughter. Additionally, even if we were to conclude that the record demonstrates prosecutorial misconduct, any error in that regard is harmless. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 3} This case arises from the murder of Tracey Lowry in early 2004. Lowry's body was found in a deserted house at 315 Holt Street. Following an investigation, the police determined that Damian Brodie and Elgin Wilson were responsible for Lowry's death.
 {¶ 4} Brodie was indicted on one count of Aggravated Murder, in violation of R.C. 2903.01(B) (Count One of the Indictment), one count of Murder, in violation of R.C. 2903.02(B) (Count Three of the Indictment), and one count of Aggravated Robbery, in violation of R.C. 2911.01(A)(1). All three counts carried firearm specifications. He was also indicted on one count of having a Weapon Under a Disability, in violation of R.C. 2923.13(A)(3). He waived his right to a jury, and the matter proceeded to a bench trial.
 {¶ 5} Bryant Abner testified that he was acquainted with Brodie and Elgin Wilson, and that he considered them friends. Abner testified that he ran into Brodie and Wilson and that the two men began to talk about a "dead body." Abner testified that Brodie and Wilson asked him whether he wanted to see the body and that they then took Abner to a deserted house on Holt Street. Abner testified that they entered the house and proceeded to the second floor, where he observed the body. Abner testified that he left the house and that he later took his brother, Drew Martin, and a friend, Barry Martin, to the house to see the body.
 {¶ 6} Drew Martin testified that he was acquainted with Brodie and Wilson, both of whom lived in his neighborhood. Drew testified that his brother took him and his friend, Barry Martin, to see a dead body in a house on Holt Street. Barry Martin did not enter the house. Drew testified that Abner informed him that Brodie had originally shown Abner the body. Drew testified that he left the house and called 911.
 {¶ 7} Drew testified that he was out driving the next day with Barry Martin when they observed Brodie walking with his baby. Drew testified that he offered Brodie a ride. During the ride, Brodie stated that he "got his stripes." According to Drew this meant that "he [had] killed somebody." Drew testified that Brodie went on to state that he and Elgin had both shot a person. Drew also testified that he had observed Brodie with a handgun, and that he knew that Brodie and Elgin shared that handgun.
 {¶ 8} The State presented the testimony of Barry Martin, who was also acquainted with Brodie and Elgin. Barry Martin testified that he went to see the body with Drew and Abner, but he did not enter the house. Martin's testimony corroborated the testimony of Drew Martin with regard to Brodie's statement that he was involved in causing the death of the victim. Barry also testified that he had also observed Brodie and Elgin sharing a handgun around the time of the death.
 {¶ 9} Dayton Police Officer Christen Beane testified that she interviewed Brodie during the investigation of Lowry's death. According to Beane, Brodie informed her that he and Elgin had been out walking around when they observed Lowry. The two decided to follow Lowry and rob him. As they were following Lowry, they observed him meet a woman. Brodie and Elgin then followed Lowry and the woman to a deserted house located at 315 Holt Street. After Lowry and the woman entered the house, Brodie and Elgin followed. They encountered the couple in a room on the second floor. According to Brodie, Elgin pointed a gun at Lowry. They then demanded that Lowry give them money. Lowry took out some money and dropped it on the floor. Brodie retrieved the money. Brodie then let the woman leave. Elgin then instructed Lowry to hand over the rest of his money. Lowry refused. Brodie told Beane that after the woman left, Lowry picked up a loose door and moved toward him and Elgin. Brodie told Beane that Elgin fired once and that Brodie ran out of the room, at which time he heard a second shot.
 {¶ 10} The State also presented the testimony of Bryan Casto, M.D. Dr. Casto testified that he is a forensic pathologist and that he works as a deputy coroner for Montgomery County. Casto testified that Lowry suffered two gunshot wounds; one to his left shoulder and one to his chest. Casto testified that the gunshot to the shoulder traveled through Lowry's left lung and punctured two large vessels directly above the heart. The other gunshot wound traveled downward, causing damage to Lowry's liver and intestine. Casto testified that both wounds were sustained prior to death, and that either wound, alone, could have been fatal.
 {¶ 11} Following the trial, the judge found Brodie guilty of two counts of Murder (on the count of Aggravated Murder, the trial judge found Brodie not guilty of Aggravated Murder, but guilty of the lesser-included offense of Murder), one count of Aggravated Robbery and one count of Having Weapons Under Disability and sentenced Brodie accordingly. From his conviction and sentence, Brodie appeals.
 II {¶ 12} Brodie's First Assignment of Error is as follows:
 {¶ 13} "APPELLANT'S CONVICTIONS WERE AGAINST THE SUFFICIENCY AND/OR THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 14} Brodie contends that the State did not present evidence sufficient to support his convictions for Murder. He also contends that the Murder convictions are against the manifest weight of the evidence.
 {¶ 15} A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 16} In contrast, when reviewing a judgment under a manifest weight standard of review "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." Thompkins, supra, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175.
 {¶ 17} Brodie was convicted of two counts of Murder [Count One of the indictment was based upon the underlying Aggravated Robbery offense and Count Three of the indictment was based upon Felonious Assault] in violation of R.C. 2903.02(B). That statute provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or2903.04 of the Revised Code."
 {¶ 18} In order to commit Felonious Assault a person must knowingly cause serious physical harm to another. R.C. 2903.11. Aggravated Robbery is defined as follows by R.C. 2911.01.
 {¶ 19} "(A) No person, in * * * committing a theft offense * * * shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."
 {¶ 20} As with Felonious Assault, the culpable mental state for the theft Aggravated Robbery is "knowingly". State v.Bumphus (1976), 53 Ohio App. 2d 171. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). It is well settled that "a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts, and intent can be determined from the surrounding facts and circumstances." State v. Carter (1995), 72 Ohio St.3d 545, 554. Further, "an unarmed accomplice in an aggravated robbery may be charged under R.C. 2911.01(A) and punished as if he were a principal." State v. Frost, Montgomery App. No. 20588,2005-Ohio-5510, ¶ 20. "In such a case, the actions of the principal are imputed to the accomplice, and the accomplice `may be found to have committed every element of the offense committed by the principal, including possession of the weapon.'" Id., quoting, State v. Letts (June 22, 2001), Montgomery App. No. 15681.
 {¶ 21} The testimony of Officer Beane demonstrates that Brodie and Wilson conspired to rob Lowry. Indeed, there is no dispute that Brodie was involved in a theft offense at the time. The evidence further shows that Brodie was aware that Wilson had the handgun and that the gun actually belonged to Brodie. The evidence shows that Wilson pulled the handgun out the moment he and Brodie entered the room and encountered Lowry, and that they were within very close range of Lowry. The record further shows that Brodie was the one who first told Lowry to "get his money out." Brodie stated that he was the one who retrieved the money and that he was the one who informed the woman that she could leave the premises. At that point, the offense of Aggravated Robbery had been committed.
 {¶ 22} The evidence further demonstrates that Wilson then told Lowry to get out more money, but that Lowry refused and said, "[y]ou're gonna have to kill me." According to Brodie, Wilson indicated that he was not "playing." Brodie stated that he then knew that "it was about to get ugly." Brodie further stated that after Lowry picked up a loose door, Brodie moved behind Wilson because Brodie was not armed. Wilson then shot Lowry. At that point, the offense of Felonious Assault had been committed.
 {¶ 23} There is sufficient evidence to prove, beyond reasonable doubt, that Brodie helped plan the robbery, that he was aware that Wilson had the handgun, that he did not object to the use of the handgun during the commission of the crime, and that he even used Wilson as a shield, because Wilson had the gun. The State also produced evidence demonstrating that Brodie bragged about having shot someone.
 {¶ 24} Upon this evidence in the record, a reasonable fact finder could conclude that Brodie was an active, willing participant in the offenses of Aggravated Robbery and Felonious Assault, and that Lowry's death was a proximate result of both of these offenses. Further, a reasonable fact finder could conclude that by acquiescing to the use of his own gun in the commission of the crime, by admitting that he knew things would get "ugly," and by using the actual gunman as protection, Brodie had the requisite knowledge. Thus, we conclude that the evidence is sufficient to support the convictions for Murder and that the convictions are not against the weight of the evidence.[1]
 {¶ 25} The First Assignment of Error is overruled.
 III {¶ 26} The Second Assignment of Error is as follows:
 {¶ 27} "THE TRIAL COURT DEPRIVED APPELLANT OF DUE PROCESS AND A FAIR TRIAL THROUGH ERRONEOUSLY FAILING TO CONSIDER AN INVOLUNTARY MANSLAUGHTER CHARGE."
 {¶ 28} Brodie contends that the trial court erred by rejecting his request for consideration of Involuntary Manslaughter as a lesser-included offense of the Murder charges. Although his argument in this regard is not clear, a review of the transcript sheds light on this claim. Prior to sentencing, defense counsel urged the trial court to convict Brodie of Involuntary Manslaughter, rather than Murder. In support, he argued that the State had failed to prove that Lowry was killed during the commission of a felony, as required by the Murder statute. Counsel claimed that Brodie was engaged in a misdemeanor offense, at most, when Lowry was shot. Specifically, he argued that the facts supported a finding that Brodie was engaged in a misdemeanor Theft, rather than a felony, at the time of the shooting, and that therefore, he should only be convicted of Involuntary Manslaughter, in violation of 2903.04(B). This appears to be, in essence, a sufficiency of the evidence claim.
 {¶ 29} Thus, the crux of this assignment of error is whether the State proved that Lowry was killed during the commission of a felony or whether Brodie was merely engaged in a misdemeanor theft when Wilson, acting separately, killed Lowry.
 {¶ 30} A Theft occurs when a person "with purpose to deprive the owner of property or services, * * * knowingly obtain[s] or exert[s] control over either the property or services in any of the following ways: (1) Without the consent of the owner or person authorized to give consent; (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent; (3) By deception; (4) By threat; (5) By intimidation." See, R.C. 2913.02.
 {¶ 31} There is evidence that can be construed as supporting a theft offense by reason of threat or intimidation. However, in our view, the use of the firearm during the commission of the crime militates against a finding of misdemeanor Theft.
 {¶ 32} The trial court found beyond reasonable doubt, based upon the evidence, that Brodie and Wilson were engaged in an Aggravated Robbery at the time Lowry was killed. The evidence shows that Brodie and Wilson acted in concert, and that each engaged in the offense of Aggravated Robbery. Indeed, it can reasonably be inferred that Wilson intended to cause serious physical harm to Lowry when he aimed a gun, at close range, at Lowry. Since Brodie knew that the gun was being used, and because he tacitly approved its use, it can also be inferred that Brodie, as an accomplice, intended to cause serious physical harm to Lowry.
 {¶ 33} We conclude that the trial court did not err when it found beyond reasonable doubt that Brodie was guilty of Felony Murder.
 {¶ 34} In the trial judge's remarks on the record, following the submission of the case to him after arguments of counsel, he indicated that he would not consider Involuntary Manslaughter as a possible lesser-included offense of Murder, reciting an analysis similar to the analysis a trial judge would use in deciding whether to instruct a jury on a lesser-included offense. However, any possible basis for assigning error in this regard was removed when the trial court, in its written decision giving its verdict, expressly found that Brodie was complicit, not in a misdemeanor offense, but rather in a felony offense, for which there was abundant evidence. Thus, even if the trial court erred in concluding that it could not properly consider the lesser-included offense of Involuntary Manslaughter, upon the ground that a reasonable finder of fact might have found Brodie to have been complicit merely in a misdemeanor Theft offense, that error became harmless when the trial court, acting as the finder of fact in this bench trial, found, beyond reasonable doubt, that Brodie had been complicit in the Aggravated Robbery offense, thereby making the death of the victim proximately caused thereby the offense of Felony Murder.
 {¶ 35} The second assignment of error is overruled.
 IV {¶ 36} Brodie's Third Assignment of Error states:
 {¶ 37} "APPELLANT WAS DEPRIVED OF A FAIR TRIAL AS A RESULT OF PROSECUTORIAL MISCONDUCT."
 {¶ 38} Brodie maintains that the prosecutor engaged in a pattern of prosecutorial misconduct depriving him of a fair trial by repeatedly asking leading questions.
 {¶ 39} The relevant inquiry in a claim of prosecutorial misconduct is whether the prosecutor's conduct was improper, and if so, whether a substantial right of the accused was adversely affected. State v. Cornwell, 86 Ohio St.3d 560, 570,1999-Ohio-125.
 {¶ 40} Brodie cites five separate instances where the prosecutor did ask leading questions of the State's witnesses. For example, the prosecutor asked a witness if he knew whether Brodie and Wilson "both used the same gun" and whether Brodie and Wilson "would exchange it back and forth." Defense counsel objected only to two of the cited references. The trial court sustained the objections that were raised.
 {¶ 41} Even were we to conclude that the prosecutor asked improper leading questions of its witnesses, we would find any error to be harmless because there is a presumption that in a bench trial the trial court relies "only on relevant, material, and competent evidence in arriving at its judgment." State v.Lane (1995), 108 Ohio App.3d 477, 484.
 {¶ 42} Brodie does not allege that the trial court acted improperly with regard to the State's leading questions or that the judge was improperly influenced by them. Thus, we cannot conclude that Brodie was deprived of a fair trial.
 {¶ 43} Accordingly, the Third Assignment of Error is overruled.
 V {¶ 44} All of Brodie's assignments of error having been overruled, the judgment of the trial court is affirmed.
Grady and Donovan, JJ., concur.
[1] We note that for purposes of sentencing, the two offenses were merged.