[Cite as *State v. King*, 2022-Ohio-3178.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-09-116 |
| | : | O P I N I O N |
| - vs - | | 9/12/2022 |
| | : | |
| MYCHEL KING, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2020-11-1454

Michael T. Gmoser, Butler County Prosecuting Attorney, and Willa Concannon, Assistant Prosecuting Attorney, for appellee.

Repper-Pagan Law., Ltd., and Christopher J. Pagan, for appellant.

**S. POWELL, J.**

{¶ 1}   Appellant, Mychel King, appeals his conviction in the Butler County Court of Common Pleas after a jury found him guilty of aggravated murder with an accompanying three-year firearm specification.   For the reasons outlined below, we affirm King's conviction.

{¶ 2}   On December 4, 2020, a Butler County Grand Jury returned a nine-count

indictment charging King with, among other offenses and specifications, aggravated murder in violation of R.C. 2903.01(B). The charges arose after it was alleged King shot and killed the 18-year-old victim, Jaylon Knight, on the morning of March 11, 2016. The shooting occurred after Knight was lured into driving to a vacant house located at 318 Charles Street in Hamilton, Butler County, Ohio by someone identified online as "Bri Princess" for the purpose of selling "Bri Princess" marijuana. There is no dispute that Knight's vehicle's driver's side doorhandle, which was found nearby to where Knight was shot and killed, contained both King's fingerprints and DNA.[1] There is also no dispute that King, King's grandmother, King's father, and King's mother all lived within a few blocks of where Knight was murdered.

{¶ 3} On December 10, 2020, King entered a not guilty plea to all nine charged offenses and specifications. Several months later, on April 1, 2021, King filed a motion to suppress evidence he claimed was "illegally obtained" by the police during their investigation into Knight's murder. This included a single size 13 shoe with a distinct tread pattern matching the large size 13 footprints found at the scene of Knight's murder. Detectives Jim Smith and Frank Botts discovered the shoe lying on King's front porch when they initially went to King's house to speak with King about Knight's murder.

{¶ 4} On June 10, 2021, the trial court held a hearing on King's motion to suppress. During this hearing, the trial court heard testimony from, among others, both Detective Smith and Detective Botts. Once both parties rested, the trial court issued its decision from the bench denying King's motion to suppress. In so holding, the trial court initially stated:

> Det. Botts indicated that at the [scene of Knight's murder] that shoe prints were noticed. He indicated that as he approached [King's front] porch he noticed this shoe, he noticed a similarity

---

1. Knight's vehicle's driver's side doorhandle had been ripped off Knight's vehicle and dropped in the middle of Charles Street approximately 40 feet from where Knight's vehicle had ultimately come to a stop with Knight slumped over the vehicle's center console bearing gunshot wounds to the left side of his neck and left temple.

- 2 -

in the shoe prints of these shoes. That [Det. Smith and Det. Botts] entered the porch, they walked straight up from the sidewalk to the porch. The Court has reviewed the photographs. They did not trapse through other areas of the porch. They went to the porch, according to the testimony, going to the front, rang the doorbell, no one came. They looked down and immediately in front of the door, just a little bit to the right, according to the testimony of Det. Botts, here was this shoe.

The Court will find based upon the testimony of Det. Botts that the shoe was laying on its side in plain view, that there was no expectation of privacy with respect to the porch * * *. Police had the right to be at the front porch to ring the doorbell, and I think even the test – even the case law presented by [King in support of his motion to suppress, Det. Smith and Det. Botts] had the right to be at the front door.

{¶ 5} The trial court then stated:

There's no testimony, and the Court will find that [Det. Smith and Det. Botts] did not veer from the pathway that would customarily be used and went straight to the door. The shoe's laying on the ground. The shoe caught their attention because it was in plain view.

Court will find that it was proper for [Det. Botts] to be able to pick the shoe up, photograph the shoe to verify that it was important to the case. The Court will find that not only was the shoe in plain view, but it – given the circumstances of this case and the testimony of Det. Botts, that it was incriminating in nature and important to the investigation.

{¶ 6} On August 9 to August 13, 2021, the trial court held a four-day jury trial on the matter. During the state's case-in-chief, the jury heard testimony from several different witnesses directly linking King to Knight's murder. This included testimony about the discovery of King's fingerprints and DNA on Knight's vehicle's driver's side doorhandle. This also included a witness who testified that King had confessed to Knight's murder while he was incarcerated in jail awaiting trial. The jury also heard testimony regarding the various, ever evolving stories King had provided to police when he was confronted with new and/or additional evidence implicating him in Knight's murder.

- 3 -

{¶ 7} Following the close of the state's case-in-chief, King took the stand to testify in his defense. King, who was 25 years old at the time of trial, testified that he was at home just killing time playing video games before he was to walk to his father's house to help his father get ready for his dialysis appointment when he heard "a few gunshots" ring out from down the street. King testified that after hearing the gunshots that he walked downstairs and told his mother what he had heard. King testified that his mother responded and told him not to go outside. However, despite what his mother had told him, King testified that he "was even a little defiant at the age of 19" so he went outside and began walking towards his grandmother's house on Charles Street.

{¶ 8} King testified that once he turned onto Charles Street nearby to his grandmother's house that he saw a "car pressed up against a house and my attention like I didn't know what it was when I found it." King then testified, "I just thought it may be an overdose. That's something common that happened in my neighbor – like my neighborhood[.]" King testified that he then approached the car and "got up to the car" and "tugged" on the vehicle's driver's side door handle. King testified that this "tug" caused the vehicle's doorhandle to "come straight off" the vehicle and into his hand. King testified it was only then after he had already ripped the vehicle's driver's side doorhandle off that he noticed the vehicle, which had its motor still running, "had two bullet holes in the windshield."

{¶ 9} King testified that after noticing the two bullet holes in the vehicle's windshield that he then "proceeded to walk into the street around the car" where he "dropped the door handle in the street." King then testified that because he did not know if "somebody was still in the area or not," and for some reason not wanting to just go across the street to call for help from his grandmother's house, he proceeded the three or four blocks to his father's house. King testified that once at his father's house that he helped his father get ready for his dialysis appointment, walked his father to the bus stop, and waited with his father for the

bus to arrive. King testified that after his father was on the bus that he then walked the three or four blocks back towards his grandmother's house on Charles Street.

{¶ 10} King testified that as he approached his grandmother's house on Charles Street that he heard sirens and saw police, paramedics, and a fire truck parked across from her house. King testified that he also saw yellow police tape stretched across both sides of Charles Street that he had to duck under to get into his grandmother's house. King testified that after going into his grandmother's house that he then went back outside and across the street with his grandmother and approached the vehicle "close enough to touch it." Thereafter, when asked why his trial testimony differed from the earlier statements he had provided to police, King acknowledged that he had lied to police, but did so because he "was scared to be caught up in the situation," "scared of what the law may think," and because he "don't want to be a snitch" and "frowned on by [his] community." King also testified that, although the state had presented a witness who claimed he had confessed to Knight's murder, he had actually never confessed to Knight's murder to this witness or to anybody else.

{¶ 11} Once both parties rested, the trial court provided its final instructions to the jury. This included the trial court instructing the jury on complicity. Upon receiving its final instructions, the jury was excused from the courtroom to begin its deliberations. Following deliberations, the jury returned a verdict finding King guilty as charged on all nine offenses and specifications. The following month, on September 23, 2021, the trial court held a sentencing hearing. During this hearing, the trial court merged all nine offenses and firearm specifications into one count of aggravated murder with a single three-year firearm specification. The trial court then sentenced King to 25 years to life in prison for the aggravated murder, plus an additional three-year prison term on the accompanying firearm specification, for a total, aggregate sentence of 28 years to life in prison. The trial court

also ordered King to pay a $25,000 fine and court costs.

{¶ 12} On August 29, 2021, King filed a timely notice of appeal. Oral argument was held before this court on July 18, 2022. The appeal now properly before this court for decision, King has raised four assignments of error for review.

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE TRIAL COURT ERRED BY OVERRULING THE SUPPRESSION MOTION.

{¶ 15} In his first assignment of error, King argues the trial court erred by denying his motion to suppress the size 13 shoe that Detectives Smith and Botts found on his front porch. When arguing this claim, however, King does not dispute that Detectives Smith and Botts were lawfully present on the porch where the shoe was located. King also does not dispute that the shoe was lying on its side with its distinctive tread pattern facing away from the house in plain view. King instead argues "the manipulation" of the shoe that occurred when Detective Botts picked up the shoe, turned the shoe over in his hand, and took a photograph of the shoe's sole and distinctive tread pattern was "a warrantless search that required probable cause." We disagree.

{¶ 16} "Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact." *State v. Turner*, 163 Ohio St.3d 421, 2020-Ohio-6773, ¶ 14, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence to resolve factual questions and evaluate witness credibility." *State v. Green*, 12th Dist. Fayette No. CA2021-03-009, 2022-Ohio-101, ¶ 7. "Therefore, when reviewing a trial court's decision on a motion to suppress, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Stout*, 12th Dist. Butler No. CA2020-08-085, 2021-Ohio-1125, ¶ 11; *State v. Hawkins*, 158 Ohio St.3d 94, 2019-

Ohio-4210, ¶ 16. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. This means "the appellate court must decide the legal questions independently, without deference to the trial court's decision." *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, ¶ 14; *State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, ¶ 18.

{¶ 17} To support his argument, King cites the United States Supreme Court's decision in *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149 (1987). "In *Hicks*, police lawfully entered an apartment to investigate a shooting, and, suspecting that expensive stereo equipment in the apartment was stolen, moved some of the stereo equipment to observe and check the serial numbers on the equipment." *State v. Green*, 12th Dist. Warren No. CA2004-11-134, 2005-Ohio-6871, ¶ 21. Based on these facts, the United States Supreme Court "held that recording the serial numbers of the stereo equipment was not a seizure because it did not interfere with a defendant's possessory interest, but, moving the equipment to see the serial numbers constituted a search." *Id.* That is to say, in *Hicks*, the United States Supreme Court "held that the criminal nature of stolen stereo equipment discovered by police after they lawfully entered the apartment where the equipment was stored was not immediately apparent where the officers had to first move the equipment to read and record its serial numbers." *State v. Simpson*, 7th Dist. Columbiana No. 01 CO 13, 2002-Ohio-1565, ¶ 26. "In this context, the term 'immediately apparent' means that the officer must have had probable cause to believe the item was contraband." *State v. Simmons*, 12th Dist. Warren No. CA2004-11-138, 2005-Ohio-7036, ¶ 21, citing *Hicks* at 326.

{¶ 18} King argues this case is analogous to *Hicks* given that Detective Botts

- 7 -

"manipulated" the shoe when he picked it up and turned it over in his hand so that he could "view and photograph" the shoe's sole and distinctive tread pattern. However, while there is no doubt that Detective Botts did, in fact, move the shoe so that he could take a better, more close-up photograph of the shoe's sole, the record firmly establishes that the shoe was already lying on its side with its distinctive tread pattern facing away from the house in plain view for Detectives Smith and Botts to see. The fact that Detective Botts picked up the shoe and turned it over in his hand so that he could take a better photograph of the shoe's sole does not transform what was otherwise in Detectives Smith's and Botts' plain view into something that was not. Therefore, because the mere observation of an object in plain view does not constitute a search, *State v. Young*, 12th Dist. Warren No. CA2014-05-074, 2015-Ohio-1347, ¶ 28, and because officers can photograph scenes presented to their plan view if they occupy a lawful vantage point, *State v. Hahn*, 3d Dist. Henry No. 7-21-02, 2021-Ohio-3789, ¶ 19, the trial court did not err by denying King's motion to suppress the size 13 shoe that was found on King's front porch. Accordingly, King's first assignment of error lacks merit and is overruled.

{¶ 19} Assignment of Error No. 2:

{¶ 20} THE TRIAL COURT GAVE A FAULTY COMPLICITY INSTRUCTION.

{¶ 21} In his second assignment of error, King argues the trial court committed plain error by instructing the jury on complicity in the manner that it did. To support this claim, King makes a variety of arguments based primarily on old caselaw. However, the trial court's complicity instruction in this case was nearly identical to the language found in the complicity statute, R.C. 2923.03. The trial court's complicity instruction also tracked the language found in the Ohio Jury Instructions. *See Ohio Jury Instructions*, CR Sections 523.03(A) and (B) (Rev. Feb. 6, 2016). The trial court's complicity instruction further mirrored the elements of complicity as stated by both this court in *State v. Grievous*, 12th

Dist. Butler No. CA2018-05-093, 2019-Ohio-1932, ¶ 13, and the Ohio Supreme Court in *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, syllabus. Therefore, while King may disagree, the trial court's complicity instruction fairly and correctly stated the law as it now stands in Ohio. Under these circumstances, we must affirm. *See State v. Sexton*, 12th Dist. Warren No. CA2018-08-100, 2020-Ohio-153, ¶ 7 (this court must affirm a conviction if the trial court's jury instructions, when taken in their entirety, fairly and correctly state the law applicable to the evidence presented at trial). Accordingly, finding no error, let alone plain error, in the way the trial court instructed the jury on complicity, King's second assignment of error lacks merit and is overruled.

{¶ 22} Assignment of Error No. 3:

{¶ 23} COMPLICITY TO A GUN SPECIFICATION FAILS TO STATE A CRIMINAL OFFENSE.

{¶ 24} In his third assignment of error, King argues the trial court erred by sentencing him on the firearm specification to an additional, consecutive three years in prison as required by R.C. 2929.14(B)(1)(a)(ii). To support this claim, King makes a general allegation that there can be "no liability" for complicity to a firearm specification because the complicity statute, R.C. 2923.03, is limited to "offenses, not enhancements." We agree that complicity to a firearm specification is not a criminal offense. *See State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, paragraph one of the syllabus ("a firearm specification is a penalty enhancement, not a criminal offense"). However, "the Ohio Supreme Court has held that [an accused] is subject to a sentencing enhancement on a firearm specification regardless of whether he was the principal or an unarmed accomplice." *State v. Humphries*, 8th Dist. Cuyahoga No. 99924, 2014-Ohio-1230, ¶ 18, citing *State v. Chapman*, 21 Ohio St.3d 41, 42 (1986). "In such a case, the actions of the principal are imputed to the accomplice, and the accomplice 'may be found to have committed every element of the

- 9 -

offense committed by the principal, including possession of the weapon.'" *State v. Frost*, 164 Ohio App.3d 61, 2005-Ohio-5510, ¶ 20 (2d Dist.), quoting *State v. Letts*, 2d Dist. Montgomery No. 15681, 2001 Ohio App. LEXIS 2749, *9 (June 22, 2001). Therefore, even assuming the jury found King guilty as an accomplice rather than as the principal offender, the trial court did not err by sentencing him on the firearm specification to an additional, consecutive three years in prison as required by R.C. 2929.14(B)(1)(a)(ii). *See State v. Moore*, 7th Dist. Mahoning No. 12 MA 8, 2013-Ohio-1435, ¶ 65 ("a firearm specification was and still is an enhancement to a predicate offense, and the complicity statute provides that the person complicit in the offense can be prosecuted 'and punished' as if he were the principal"). Accordingly, King's third assignment of error lacks merit and is overruled.

{¶ 25} Assignment of Error No. 4:

{¶ 26} THE TRIAL COURT ERRED BY EXCLUDING THE "SHE'S HERE" STATEMENT FROM EVIDENCE.

{¶ 27} In his fourth assignment of error, King argues the trial court erred by excluding an officer's proffered testimony that the victim, Knight, had allegedly told his now deceased brother, Markel Morrison, during a telephone conversation between Knight and Morrison that took place just prior to when Knight was shot and killed that "she's here" and that "a female had come out and was in front of his [Knight's] car." We disagree.

{¶ 28} "A trial court's decision to admit or exclude evidence will not be reversed by a reviewing court absent an abuse of discretion." *State v. McLaughlin*, 12th Dist. Clinton No. CA2019-02-002, 2020-Ohio-969, ¶ 42. "This court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard." *State v. Gearhart*, 12th Dist. Warren No. CA2017-12-168, 2018-Ohio-4180, ¶ 13. An abuse of discretion connotes more than an error of law or judgment; it implies the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Grindstaff*, 12th Dist. Clermont No. CA2013-09-074,

2014-Ohio-2581, ¶ 21. "A decision is unreasonable when it is 'unsupported by a sound reasoning process.'" *State v. Grimm*, 12th Dist. Clermont No. CA2018-10-071, 2019-Ohio-2961, ¶ 10, quoting *State v. Abdullah*, 10th Dist. Franklin No. 07AP-427, 2007-Ohio-7010, ¶ 16. This court "should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 14, citing *State v. Smith*, 12th Dist. Fayette No. CA2007-10-035, 2008-Ohio-5931, ¶ 33.

{¶ 29} For the first time on appeal, King argues the officer's proffered testimony regarding what Morrison had told him about what Knight purportedly said to Morrison just prior to Knight's murder was admissible for either impeachment purposes or as a present sense-impression under Evid.R. 803(1). King also argues, for the first time on appeal, that the trial court's decision to exclude the officer's proffered testimony violated his due process right to "present a defense." However, even when this issue is reviewed for the more lenient abuse of discretion standard rather than for plain error, we can find no error in the trial court's decision to exclude this double-hearsay statement from evidence at trial. We instead find the trial court's decision to exclude this testimony was, at worst, harmless error given the overwhelming evidence that King was, at the very least, complicit in setting up the shooting that led to Knight's death. This is because, regardless of whether a female was present at the time the shooting took place, the presence of a female accomplice does not diminish King's own criminal culpability for Knight's murder. *See State v. Rosebrook*, 11th Dist. Geauga No. 2016-G-0099, 2017-Ohio-9261, ¶ 50 ("[u]nder the theory of accomplice liability, anyone who is an accomplice to a crime shall be prosecuted and punished as if she were a principal offender"), citing R.C. 2923.03(F); *see also State v. Lynch*, 8th Dist. Cuyahoga No. 84637, 2005-Ohio-3392, ¶ 11.

{¶ 30} The presence of a female accomplice also does not contradict the

overwhelming evidence that King was the shooter. This includes the testimony directly linking King to Knight's murder given the presence of King's fingerprints and DNA on the driver's side doorhandle of Knight's vehicle. This also includes the size 13 shoe with the distinctive tread pattern that Detectives Smith and Botts found on King's front porch that matched the large size 13 footprints found at the scene of Knight's murder. That is to say nothing of King's own trial testimony and farfetched explanation of what he was supposedly doing at the time of Knight was shot and killed across the street from King's grandmother's house and just around the corner from where King lived with his mother. "The improper exclusion of evidence is harmless where the remaining evidence provides overwhelming proof of a defendant's guilt." *State v. Smith*, 3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 20, citing *State v. Murphy*, 91 Ohio St.3d 516, 555 (2001). Therefore, because any error the trial court may have made by excluding this double-hearsay statement from evidence was, at worst, harmless error, King's fourth assignment of error lacks merit and is overruled.

**{¶ 31}** Judgment affirmed.

M. POWELL, P.J., and HENDRICKSON, J., concur.