[Cite as *State v. Lavette*, 2019-Ohio-145.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 106169

STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

**CARL O. LAVETTE, III**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-616035-B

**BEFORE:** E.T. Gallagher, J., Kilbane, A.J., and Keough, J.

**RELEASED AND JOURNALIZED:** January 17, 2019

**ATTORNEYS FOR APPELLANT**

Mark Stanton
Cuyahoga County Public Defender

BY:    Erika B. Cunliffe
Assistant Public Defender
Courthouse Square, Suite 200
310 Lakeside Avenue
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY:    Eleina Thomas
       Brad Meyer
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


]EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant, Carl Lavette, III, appeals from his convictions and sentence following a jury trial.   He raises the following assignments of error for review:

1. The trial court committed error and denied Mr. Lavette his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution and Section 10, Article 1 of the Ohio Constitution when it denied him his right to represent himself without first inquiring of him his reasons for invoking that right.

2. The trial court's admission of "other acts" evidence purportedly so that the prosecution could prove course of conduct or modus operandi violated Mr. Lavette's right to confrontation, due process, and the presumption of innocence as well as the state rules of evidence.

3. Mr. Lavette's convictions on the firearm specifications are contrary to the weight of the evidence, and, thereby in violation of his right to due process.

4. The trial court violated Mr. Lavette's right to due process when it seized cars belonging to his fiancée and other family members.

5. Mr. Lavette's sentence was excessive and unconstitutionally disparate to the sentence received by his more culpable codefendant.

{¶2} After careful review of the record and relevant case law, we affirm Lavette's convictions and sentence.

## I. Procedural and Factual History

{¶3} In April 2017, Lavette and his codefendant, Christopher Everette, were named in a 53-count indictment for their involvement in a string of robberies that took place in Cuyahoga County during a two-week period in September 2016.[1] The indictment alleged that Lavette participated in three separate robberies occurring in Richmond Heights, Euclid, and Shaker Heights, Ohio.

{¶4} Relevant to this appeal, Lavette was charged with aggravated robbery in violation of R.C. 2911.01(A)(1), with firearm specifications (Count 11); aggravated robbery in violation of R.C. 2911.01(A)(1), with firearm specifications (Count 12); robbery in violation of R.C. 2911.02(A)(2), with firearm specifications (Count 14); robbery in violation of R.C. 2911.02(A)(2), with firearm specifications (Count 15); kidnapping in violation of R.C. 2905.01(A)(2), with firearm specifications (Count 17); kidnapping in violation of R.C. 2905.01(A)(2), with firearm specifications (Count 18); having weapons while under disability in violation of R.C. 2923.13(A)(3) (Count 21); carrying a concealed weapon in violation of R.C. 2923.12(A)(2) (Count 22); aggravated robbery in violation of R.C. 2911.01(A)(1), with firearm specifications (Count 28); robbery in violation of R.C. 2911.02(A)(2), with firearm specifications

---

[1] The April 2017 indictment superseded the original indictment filed in December 2016 in Cuyahoga C.P. No. CR-16-611794-B.

(Count 29); kidnapping in violation of R.C. 2905.01(A)(2), with firearm specifications (Count 30); having weapons while under disability in violation of R.C. 2923.13(A)(3) (Count 32); carrying a concealed weapon in violation of R.C. 2923.12(A)(2) (Count 33); aggravated robbery in violation of R.C. 2911.01(A)(1), with firearm specifications (Count 34); aggravated robbery in violation of R.C. 2911.01(A)(1), with firearm specifications (Count 35); robbery in violation of R.C. 2911.02(A)(2), with firearm specifications (Count 36); robbery in violation of R.C. 2911.02(A)(2), with firearm specifications (Count 37); kidnapping in violation of R.C. 2905.01(A)(2), with firearm specifications (Count 38); kidnapping in violation of R.C. 2905.01(A)(2), with firearm specifications (Count 39); having weapons while under disability in violation of R.C. 2923.13(A)(3) (Count 41); carrying a concealed weapon in violation of R.C. 2923.12(A)(2) (Count 42); and possession of criminal tools in violation of R.C. 2923.24(A), with a forfeiture specification (Count 53). The offenses correlated to separate victims involved in each of the three robberies.

{¶5} In May 2017, Lavette filed a pro se motion to disqualify counsel, arguing that defense counsel demonstrated a conflict of interest by "handling the case unreasonably," "performing incompetently," and "not devoting full effort to the defendant." The trial court addressed the basis of Lavette's motion during a hearing held in June 2017. During the hearing, Lavette expressed concerns with whether defense counsel was willing to put forth the effort necessary to ensure a fair trial. Thus, Lavette requested that "if [defense counsel] does not want to represent me properly, [then] he [must] disqualify himself as counsel." Following a brief discussion, the trial court denied Lavette's pro se motion to disqualify counsel. The court opined that despite Lavette's concerns, defense counsel was working in Lavette's best interests

by negotiating a plea with the state, filing appropriate motions, making appropriate arguments, appearing for all pretrials, and actively communicating with his client.

{¶6} The matter proceeded to a bifurcated trial the following day,[2] where the following evidence was adduced.

### Robbery of the Gas & Go in Richmond Heights, Ohio on September 19, 2016

{¶7} On September 19, 2016, Wilmerie Ruiz was working the register at a Gas & Go gas station located in Richmond Heights, Ohio. Ruiz testified that at approximately 8:00 p.m., a man, later identified as codefendant Everette, walked into the gas station and brandished a gun. Ruiz stated that her boyfriend and her daughter were visiting her at the time of the robbery. The suspect placed Ruiz's boyfriend into a headlock, pointed the gun at him, and threatened to kill him if Ruiz did not give him all the money in the register. Ruiz's daughter was using the restroom at the time the suspect entered the gas station. When she came out of the restroom, the suspect briefly pointed the gun at her. Ruiz stated that there was a second man, later identified as Lavette, in the gas station during the robbery. Ruiz testified that when the suspect brandished his gun, the second man put his hands in the air and told Ruiz to "calm down and just give [the suspect] the money." However, at one point, the second man began helping her put the money into a plastic bag. Ruiz testified that the second man only touched the money with his left hand because he had a cast on his right hand.

{¶8} Ruiz testified that she did not find the second man's actions to be suspicious at the time of the robbery. For this reason, she did not mention the second man in her written police report. However, she testified that, with time to reflect on the incident, she began to believe the

---

[2] Lavette waived his right to a jury trial on the having weapons while under disability offenses.

second man was involved in the robbery because he did not wait for the police to arrive and quickly left the store. Surveillance video footage of the incident taken inside the gas station was played for the jury.

{¶9} Patrolman Eric McFarland of the Richmond Heights Police Department testified that on September 19, 2016, he responded to a call for a robbery in progress at the Gas & Go gas station. Upon responding to the scene, Officer McFarland ensured that the employees and customers of the gas station were safe and that no suspects were on the scene. During the investigation, the police learned that the alleged suspect had purchased a bottle of iced tea before he came back inside the gas station and brandished his gun. Officer McFarland testified that he recovered the iced tea bottle from the scene to be tested for possible DNA. Regarding Lavette, Officer McFarland testified that the police learned "that there was another possible customer in the store that employees thought was acting a little bit suspiciously." The customer was holding an iced tea can that was collected for testing "just to be on the safe side."

{¶10} Patrolman Steve Molle of the Richmond Heights Police Department testified that he also responded to the Gas & Go gas station following a report of an armed robbery. Officer Molle stated that in the course of his investigation into the robbery, he obtained a written statement from an individual who witnessed the suspect fleeing the scene. From this eyewitness, the police learned that an individual matching the suspect's description was seen making "his way alongside the building between the gas station and the plaza." He then got into the passenger's side of a parked white vehicle. The vehicle was then seen leaving the parking lot with its headlights off. The eyewitness provided the police with a partial licence plate number for the white vehicle.

{¶11} Officer Molle testified that he had the opportunity to view the surveillance video footage of the incident. In addition to narrating Everette's actions during the robbery, Officer Molle noted that the customer with the cast stood out to him. He explained that it was unusual for an innocent bystander to stand so close to the suspect during the commission of the robbery and assist the cashier by placing the money into the plastic bag. Officer Molle explained that in "such a scary situation * * * I would want to get away from an individual having a gun."

{¶12} Sergeant Darren Porter of the Richmond Heights Police Department testified that during his investigation into the robbery, he obtained the surveillance video from the gas station and generated still photographs of the suspect for dissemination. Sergeant Porter testified that when he initially reviewed the surveillance footage, he found the customer with the cast to be suspicious given his interaction with the suspect during the robbery and his decision to leave the scene before the police arrived. Sergeant Porter stated that he also learned that the customer with the cast was also linked to a spree of other robberies committed by Everette throughout Cuyahoga County.

{¶13} Sergeant Porter testified he also contacted the Ohio Bureau of Criminal Investigation to inquire as to whether DNA testing could be performed on the bottle that had been handled by the suspect prior to the robbery. Once the bottle was submitted, the DNA analysis revealed a preliminary association between the DNA found on the bottle and a profile of Everette's DNA contained in the state DNA Index System. Based on this information, Sergeant Porter used a state database to compare the still images taken of the suspect during the robbery to Everette's driver's license photo. At that time, Sergeant Porter was "100 percent positive that Christopher Everette was our suspect." Following Everette's arrest, Sergeant Porter obtained a buccal swab from Everette in the jail facility and submitted it to BCI for further DNA analysis.

{¶14} Sergeant Porter testified that he later learned that Lavette was arrested in connection with his involvement in a separate robbery occurring in Euclid, Ohio. He further learned that the license plate of Lavette's white Pontiac G6 was almost a complete match with the partial licence plate number previously provided by an eyewitness. Based on this information, Sergeant Porter obtained a court order to obtain Lavette's medical records to determine whether Lavette was in a cast at the time of the Richmond Heights robbery.

{¶15} Stacy Violi is a forensic scientist in the DNA section of the Ohio Bureau of Criminal Investigation. She testified that she performed DNA testing that was submitted by the Richmond Heights Police Department and compared it to a DNA standard of Everette that was submitted by Sergeant Porter. Violi testified that the major DNA profile recovered from the bottle was consistent with the DNA extracted from Everette's standard.

{¶16} Sean Berry testified that he is employed as a cast technician at the Cleveland Clinic. Berry testified that in August 2016, Lavette fractured his right hand and required surgery. As a result of his injury, Lavette's hand was placed in a cast on September 6, 2016. His medical records reveal that the cast was removed on October 4, 2016.

**Robbery of the Sunoco in Euclid, Ohio on September 25, 2016**

{¶17} Lawanna Stamper testified that on September 25, 2016, she was working as a cashier at a Sunoco gas station in Euclid, Ohio. Stamper testified that she and a coworker were behind the cashier counter when a man wearing a blue hooded sweatshirt and blue jeans pulled out a gun and ordered her to give him all the money from the cash register. Stamper stated that the suspect pointed the gun at her coworker and "told [Stamper] if she didn't hurry up he was going to blow the [coworker]'s head off." Stamper testified that she believed the suspect's threat and that from her point of view, the gun was real. After Stamper gave the suspect the

money, he ran out of the store. Stamper testified that she immediately called the police and reported the robbery. Surveillance footage of the robbery was played for the jury.

{¶18} Detective Joshua Schultz of the Euclid Police Department testified that he was assigned to investigate the robbery at the Sunoco gas station. In addition to reviewing witness statements and the surveillance footage taken from inside the gas station, Det. Schultz secured video footage that was captured on a home security system located near the Sunoco gas station. The video was played for the jury while Det. Schultz narrated the events as they occurred. Det. Schultz testified that the video depicts a white Pontiac G6 parked on a roadway near the gas station. The driver of the vehicle then got out of the vehicle and walked to the truck area. Det. Shultz testified that the driver "kept looking back towards the Sunoco" and had "a dark-colored cast on his right forearm-hand area." The driver of the white Pontiac then got back into the vehicle and pulled closer to the curb. Det. Shultz testified that the video then depicts "an individual running from the Sunoco parking lot. He clears the fence and runs down this way as the driver [of the white Pontiac] proceeds to drive towards him." Det. Schultz testified that the individual fleeing from the Sunoco parking lot matched the description of the robbery suspect and that the driver of the white vehicle appeared to be driving towards the suspect to "pick him up." Det. Schultz opined that "it was pretty clear that the while Pontiac was involved" and that the individual with the cast was "the getaway driver for the robbery suspect."

{¶19} Det. Schultz testified that during his investigation he learned there were numerous other cities that had similar incidents involving an individual who matched the description of his suspect. In addition, Det. Schultz learned that the Richmond Heights police department identified Everette as the suspect involved in the Gas & Go gas station robbery. Based on this information, the Euclid police department questioned Everette and ultimately obtained a

confession. Thereafter, Det. Schultz spoke with several acquaintances of Everette who identified Lavette as the driver of the white Pontiac depicted in the surveillance videos. Subsequently, Det. Schultz executed a warrant for Lavette's arrest and discovered a white Pontiac G6 in the driveway of the residence where Lavette was arrested.

**Robbery of the B.P. in Shaker Heights, Ohio on September 25, 2016**

{¶20} Khorolmaa Batbaatar testified that on September 25, 2016, she was working as a cashier at a B.P. gas station located in Shaker Heights, Ohio. She testified that at approximately 11:00 a.m., a man wearing a dark blue hooded sweatshirt and matching pants approached the counter and asked to purchase gum. Batbaatar testified that she scanned the gum and the "next thing [she] knew he had a gun behind [her]" and ordered her to give him all the money from the cash register. She testified that she felt the gun near her back and that the suspect told her to "shut up or I will kill you." She stated that she was scared and felt like her body was numb. After Batbaatar put all the money into the suspect's red plastic bag, he ran out of the gas station and she immediately contacted the police.

{¶21} Officer Benjamin Ward of the Shaker Heights Police Department testified that he responded to the B.P. gas station following the robbery. He testified that while searching for the suspect on foot, he noticed that a nearby business had surveillance cameras. Officer Ward stated that the police were given access to the surveillance system and were able to recover video footage depicting a male matching the description of the suspect running northbound away from the gas station. The video then depicts a white vehicle applying its brakes as it approached the suspect.

{¶22} Detective Eric Conwell of the Shaker Heights Police Department testified that he was assigned to investigate the robbery of the B.P. gas station. In the course of his

investigation, Det. Conwell spoke with the victim and obtained a detailed description of the suspect. In addition, Det. Conwell received bulletins from neighboring police agencies that also had recent robberies at local gas stations. Upon viewing the still images involved in the other robberies, Det. Conwell determined that the individual in the photographs was likely responsible for the Shaker Heights robbery based on the victim's description of the suspect. Det. Conwell testified that he was subsequently able to identify the name of his suspect after the Richmond Heights Police Department linked Everette's DNA to the robbery at the Gas & Go gas station. Using this information, Det. Conwell prepared a photo lineup and Batbaatar identified Everette as the individual responsible for the robbery. Det. Conwell testified that area departments later had a meeting to share information about their investigations. During this meeting, Det. Conwell learned that "a white Pontiac G6 was most likely used as a getaway car in every single incident." Det. Conwell further testified that Lavette was identified as the second suspect during the meeting.

### Testimony of Codefendant Christopher Everette

{¶23} As a condition of his plea agreement with the state, codefendant Everette agreed to testify truthfully on behalf of the state. With respect to robbery of the gas station in Richmond Heights, Everette identified himself and Lavette in the surveillance video footage taken from inside the gas station during the robbery. Everette testified that earlier that day, Lavette determined that the gas station would work best because there was no glass separating the cashier from the customers. Everette testified that Lavette gave him the gun and told him to "make sure [he] get[s] the money, come out, don't waste no time." Everette testified that the gun was not loaded because Lavette had stated there was "no need to use the clip" because the victims would be scared given the size of the gun.

{¶24} Everette explained that he was "the robber" in this particular instance because Lavette's right hand was in a cast. Everette testified that Lavette decided to come inside the gas station while Everette conducted the robbery because he was concerned with the amount of traffic going in and out of the gas station and wanted to make sure everything went as planned. During the robbery, Lavette put his hands up in the air and advised the cashier to cooperate. When the robbery concluded, Everette ran to Lavette's parked vehicle and waited for Lavette. Shortly thereafter, Lavette came to the vehicle and the two men drove away from the scene. Everette testified that he and Lavette split the money evenly.

{¶25} Everette was then questioned about the incident occurring in Shaker Heights on September 25, 2015. Everette testified that Lavette picked him up in his vehicle and drove around until they found a suitable gas station. Everette stated that he entered the gas station and asked the cashier for a Black & Mild. When the cashier moved back behind to the counter, he took his gun out and instructed her to empty the cash register. When he exited the gas station, he got into the passenger's seat of Lavette's white Pontiac, which was parked "around the corner," and Lavette drove away from the scene. Everette testified that he gave Lavette back his gun and was dropped off at his home after they split the money. Surveillance video footage of the robbery was played for the jury. Everette further narrated video footage that shows him running down a nearby street and getting into Lavette's white Pontiac after the robbery.

{¶26} Regarding the incident in Euclid, Everette testified that he entered the gas station and waited for several customers to leave the store before he brandished his firearm and ordered the cashier to empty both of the registers. Everette testified that Lavette was waiting outside in his vehicle during the robbery and that it was Lavette's idea to get the money from both of the registers. Surveillance video footage was played for the jury that showed Lavette in his white

vehicle before and after the robbery. Everette identified Lavette in the video. The video then depicts Everette running towards the white vehicle after completing the robbery. Everette testified that "off screen" he got into Lavette's vehicle, gave him back his gun, and hid in the backseat. Everette stated that he split the money with Lavette and was dropped off at his house.

{¶27} At the conclusion of trial, Lavette was found guilty of five counts of aggravated robbery, with firearm specifications, as charged in Counts 11, 12, 28, 34, 35; five counts of robbery, with firearm specifications, as charged in Counts 14, 15, 29, 36, 37; five counts of kidnapping, with firearm specifications, as charged in Counts 17, 18, 30, 38, 39; three counts of carrying a concealed weapon as amended in Counts 22, 33, 42;[3] three counts of having weapons while under disability as charged in Counts 21, 32, 41; and a single count of possession of criminal tools as charged in Count 53. He was sentenced to an aggregate prison term of 24 years.

{¶28} Lavette now appeals his convictions and sentence.

## II. Law and Analysis

### A. Self-Representation

{¶29} In his first assignment of error, Lavette argues the trial court committed error and violated his constitutional rights "when it denied him his right to represent himself without first inquiring of him his reasons for invoking that right."

{¶30} After a trial has commenced, the decision about whether to grant a defendant's request to represent himself is within the discretion of the trial court. *State v. Kendrick*, 8th Dist. Cuyahoga No. 59381, 1991 Ohio App. LEXIS 5604, 3 (Nov. 21, 1981), citing *Robards v.*

---

[3] At the conclusion of the state's case, the trial court amended the carrying concealed weapons offenses from a felony to a misdemeanor of the first degree.

*Rees*, 789 F.2d 379, 384 (6th Cir.1986). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). However, "[w]hen the defendant properly invokes the constitutional right, a trial court's denial of the right to self-representation is per se, reversible error." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 32, citing *State v. Reed*, 74 Ohio St.3d 534, 660 N.E.2d 456 (1996), citing *McKaskle v. Wiggins*, 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).

{¶31} A criminal defendant's right to self-representation is rooted in the Sixth Amendment to the United States Constitution, which provides: "In all criminal prosecutions, the accused shall * * * have the Assistance of Counsel for his defense." The Ohio Constitution provides that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel." Article I, Section 10, Ohio Constitution. However, the right of self-representation is not absolute. *Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008). "To be properly invoked, a pro se request must be unequivocal and timely; otherwise, the trial court may, in its discretion, deny the request." *State v. Halder*, 8th Dist. Cuyahoga No. 87974, 2007-Ohio-5940, ¶ 50. Thus, "[a] trial court may deny a defendant's request for self-representation if it is untimely made." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 76.

{¶32} In *Cassano*, the court held that a defendant's request to represent himself made three days before trial was untimely. *Id.* at ¶ 40. Other courts have also denied requests for self-representation as untimely in similar circumstances. *See, e.g.*, *United States v. Young*, 287 F.3d 1352, 1354 (11th Cir.2002) ("a defendant's request to proceed pro se is untimely if not made before the jury is empaneled"); *Wood v. Quarterman*, 491 F.3d 196, 202 (5th Cir.2007)

("Wood did not move to proceed pro se until after the jury had already returned a guilty verdict against him, immediately before the sentencing phase of his [capital-murder] trial, and the trial court therefore had the discretion to deny the motion"); *United States v. Smith*, 413 F.3d 1253, 1281 (10th Cir.2005) (request made six days before trial untimely).

{¶33} In this case, Lavette made his verbal request for self-representation in the midst of trial. While Lavette had raised concerns with defense counsel's performance in the past, he never requested to represent himself. The state opposed Lavette's request on grounds that the motion was untimely. Following a brief discussion, the trial court inquired as to Lavette's reasons for his request to proceed pro se, and the following exchange occurred:

LAVETTE: Um, basically, I mean, you know everything. I'm just unsatisfied.

TRIAL COURT: Well, I don't understand why you're not satisfied.

LAVETTE: Because me and my lawyer has — it's like an intimidation thing. He using intimidation factor when we're not in front of the court. But when we in front of the court he uses a different persona as he wants to be my lawyer. But when I ask him things in court or while in trial to object to, he tells me, no, I'm not going to do that, I'm not doing this, I'm not doing that.

Throughout the eight months I've been in here, it's just been no, no, no, no, no. That's why we had two hearings on disqualifying counsel. Because it's just been no. I haven't — every motion I have wanted to go over with my lawyer, or the evidence, it's been no.

It got to the point that the prosecution had to show me most of the evidence, not my lawyer appointed by the court, or the state.

* * *

TRIAL COURT: Okay. And Mr. Lavette, you just indicated that you have not had any legal training, that you graduated from high school, you don't have any college education. And so [defense counsel], not only is he a very experienced lawyer, but he went to law school as well, and so he knows what is objectionable and what is not. So he understands the rules of evidence, which do you understand the rules of evidence?

LAVETTE:   Certain parts of evidence that I read over, that I asked him to object to, certain suppression hearings, and motions to suppress certain evidence that was going to be brought up in court.   And he continued to deny anything that I wanted him to do as my counsel, since he was appointed as my counsel.

TRIAL COURT:   What I'm asking you, do you know rules of evidence?

LAVETTE:   No.

TRIAL COURT:   Right. So [defense counsel] does.

* * *

TRIAL COURT:   Okay.   But I would say that never has Mr. Lavette indicated that he wanted to represent himself except now. * * * After a trial has commenced the decision whether to grant a defendant's request to represent himself is within the discretion of the court.   And in looking at the criteria, the defendant's reasons, and the quality of counsel, and the defendant's proclivity to substitute counsel, in looking at those factors, and the timeliness, I'm going to deny your request to represent yourself.

(Tr. 432-434; 436-437.)

{¶34} After careful review of the record, we find Lavette's request to represent himself in the middle of trial was untimely and, therefore, did not properly invoke the right to self-representation.   In this case, Lavette was represented by the same defense counsel for months before trial, and while he raised concerns with counsel's pretrial strategy, he never expressed a desire to represent himself.   Rather, Lavette waited until the second day of trial to verbally request to proceed pro se.   Under these circumstances, we find the trial court did not abuse its discretion and properly denied Lavette's untimely request to represent himself for the remainder of trial.

{¶35} We further reject Lavette's assertion on appeal that the trial court failed to sufficiently question him about the basis of his request to represent himself.   Here, the record reflects that the trial court adequately questioned Lavette in an effort to determine whether his request to proceed pro se was voluntarily, knowingly, and intelligently made.   As set forth in the

transcript, the trial court inquired about Lavette's concerns with defense counsel's performance and explained that many of the strategic decisions counsel was making during the trial were done in compliance with the rules of criminal procedure and evidence. In our view, the trial court's comprehensive inquiry was intended to warn Lavette of the risks of self-representation and to ascertain if he truly appreciated the quality of his defense counsel. Thus, we find the trial court made a sufficient inquiry into Lavette's request to waive counsel and represent himself, but ultimately determined the request was untimely.

{¶36} Lavette's first assignment of error is overruled.

### B. Other-Acts Evidence

{¶37} In his second assignment of error, Lavette argues the trial court erred by permitting the state to introduce inadmissible other-acts evidence in violation of Evid.R. 404(B).

{¶38} The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43.

{¶39} "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose it to show the accused's propensity or inclination to commit crime, or that he acted in conformity with bad character." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15. However, there are exceptions that allow other acts of wrongdoing to be admitted into evidence.

{¶40} R.C. 2945.59 provides that:

[i]n any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive

or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

**{¶41}** Evid.R. 404(B) also provides that evidence of other crimes, wrongs, or acts is permitted to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident.

**{¶42}** In *Williams*, the Ohio Supreme Court set forth the following three-step analysis for determining whether other acts evidence is admissible:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401.

The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B).

The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R. 403.

*Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20.

**{¶43}** In this case, the trial court permitted the state to question Everette, over defense counsel's objection, about the circumstances of four separate robberies Lavette allegedly participated in, but for which he was not indicted. In each instance, Everette testified that Lavette drove him to and from the scene of the robbery, provided the firearm used in the robbery, received half of the stolen money, and was an active participant in the planning of the robbery. The state argued that Everette's testimony about Lavette's involvement in the other robberies was admissible under Evid.R. 404(B) to show identification, modus operandi, and knowledge.

**{¶44}** We agree with the trial court that the evidence of Lavette's alleged involvement in the four robberies was relevant, and offered for a legitimate purpose to establish his identity and knowledge of the crimes under Evid.R. 404(B). However, our analysis does not end there; the third step of the *Williams* test requires us to determine whether the probative value of the evidence was outweighed by the danger of unfair prejudice as required by Evid.R. 403.

**{¶45}** In *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, the court explained that the probative value of evidence is evaluated by comparing it to evidentiary alternatives.

> Probative value is measured partially by the relative scarcity of evidence on the same issue. * * * That is, if the state offers evidence for which there is an evidentiary alternative that has substantially similar or greater probative value but is less prejudicial, the probative value of the state's evidence must be discounted. The danger of unfair prejudice is then weighed against this reduced probative value.

*Id.* at ¶ 22, citing *Old Chief v. United States*, 519 U.S. 172, 185, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

**{¶46}** After careful consideration, we find the unfair prejudice of the other acts evidence substantially outweighed its probative value. In our view, the potential prejudice of evidence associated with crimes for which the defendant was not charged is significant. Furthermore, the other acts evidence was unnecessary in this instance. Here, Everette's probative testimony concerning Lavette's direct involvement in the Richmond Heights, Euclid, and Shaker Heights robberies established Lavette's identity and knowledge of the crimes, and constituted a less restrictive evidentiary alternative. Under these circumstances, we find the trial court abused its discretion in allowing the other-acts testimony.

**{¶47}** "[I]n determining whether to grant a new trial as a result of the erroneous admission of evidence under Evid.R. 404(B), an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *State v. Morris,* 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 33. An improper admission affects a defendant's substantial rights so as to require a new trial as a remedy where there is prejudice to the defendant and the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 26-29. In making these determinations, an appellate court "must excise the improper evidence from the record and then look to the remaining evidence" for either overwhelming evidence of guilt or some other indicia that the error did not contribute to the accused's conviction. *Id.* at ¶ 29.

**{¶48}** After excising the other-acts evidence from the record, we find overwhelming evidence of Lavette's guilt. Collectively, Lavette's medical records, the surveillance video footage, and Everette's testimony concerning Lavette's involvement in the Richmond Heights, Euclid, and Shaker Heights robberies, were sufficient to convict Lavette. Accordingly, we find the error was harmless beyond a reasonable doubt.

**{¶49}** Lavette's second assignment of error is overruled.

### C. Weight of the Evidence Supporting Firearm Specifications

**{¶50}** In his third assignment of error, Lavette argues his convictions on the firearm specifications are against the manifest weight of the evidence.

**{¶51}** A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion at trial. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶

13. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence.

{¶52} "When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a 'thirteenth juror' and may disagree with the factfinder's resolution of conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). In conducting such a review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraphs one and two of the syllabus. Reversal on manifest weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387.

{¶53} On appeal, Lavette argues his firearm specification convictions are against the manifest weight of the evidence because the state failed to present credible testimony that "Christopher Everette used an 'operable' firearm during the robberies." Lavette contends his convictions rely exclusively on the "legitimate but hardly rational fears of the robbery victims." For the reasons that follow, we find no merit to Lavette's position.

{¶54} A conviction for a firearm specification under R.C. 2941.145 requires proof beyond a reasonable doubt that "the offender had a firearm on or about the offender's person or

under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶55} A "firearm" is "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant." R.C. 2923.11(B)(1). It includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable. *Id*. Thus, Everette's testimony that the gun was unloaded during the commission of the robberies did not render the gun an inoperable firearm.

{¶56} In *Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541, at paragraph one of the syllabus, the Ohio Supreme Court elaborated on the requisite proof to sustain a firearm specification:

> A firearm enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm.

{¶57} Thus, with respect to operability of a firearm in cases where no shots are fired and the firearm is not recovered, circumstantial evidence, such as the representations and actions of the gun operator, are of crucial importance. *State v. Fulton*, 8th Dist. Cuyahoga No. 96156, 2011-Ohio-4259, ¶ 34, citing *State v. Ware*, 9th Dist. Summit No. 22919, 2006-Ohio-2693, ¶ 13. The implicit threat inherent in brandishing a firearm supports an inference that the firearm was operable. *Id*.

{¶58} In addition, the Ohio Supreme Court has held that a defendant is subject to a sentencing enhancement on a firearm specification regardless of whether he was the principal or an unarmed accomplice. *State v. Chapman*, 21 Ohio St.3d 41, 42-43, 487 N.E.2d 566 (1986).

*See also State v. Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, ¶ 24 ("It is well settled that an unarmed accomplice can be convicted of an underlying felony, together with a firearm specification, based on an aider and abettor status."). In such a case, the actions of the principal are imputed to the accomplice, and the accomplice may be found to have committed every element of the offense committed by the principal, including possession of the weapon. *State v. Frost*, 164 Ohio App.3d 61, 67, 2005-Ohio-5510, 841 N.E.2d 336 (2d Dist.). *See also State v. Alexander*, 8th Dist. Cuyahoga No. 98941, 2013-Ohio-2533.

{¶59} After reviewing the entire record, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice such that the firearm specifications must be reversed. In this case, Everette testified that he pointed a handgun at the victims during the commission of the robberies. He testified that he cocked the hammer back for intimidation and did not relay to the victims that the firearm was unloaded. Regarding the Richmond Heights robbery, Ruiz testified that Everette pointed a gun at her boyfriend's head and threatened to kill him if she did not give him all the money in the register. Ruiz stated that she was "terrified for [her] life." Similarly, Stamper testified that during the commission of the robbery in Euclid, Everette pointed a gun at her and threatened to "blow her [coworker's] head off" if she did not hurry up. Finally, Batbaatar testified that during the robbery of the B.P. gas station in Shaker Heights, the suspect placed a gun near her back, ordered her to empty the cash register, and threatened to kill her if she did not stop talking.

{¶60} We find the foregoing evidence clearly demonstrates that Everette brandished a firearm and implicitly threatened to fire it during the robberies. Thus, the operability of Everette's firearm can be inferred from these facts and circumstances. Because Everette's

actions are imputed to Lavette, Lavette's convictions for the firearm specifications are not against the manifest weight of the evidence.

{¶61} Lavette's third assignment of error is overruled.

### D. Forfeiture of Vehicles

{¶62} In his fourth assignment of error, Lavette argues the trial court violated his right to due process when it seized cars belonging to his fiancée and other family members.

{¶63} In this case, Lavette was indicted for possessing criminal tools in violation of R.C. 2923.24(A). The offense carried a forfeiture of property specification that alleged that Lavette "is the owner or possessor of a Pontiac G6 and a Jaguar [sedan] that is contraband and/or property derived from or through the commission or facilitation of an offense, and/or is an instrumentality the offender used or intended to use in the commission or facilitation of a felony offense." At the conclusion of trial, the jury returned a guilty verdict on the possession of criminal tools offense. However, the jury found, by the greater weight of the evidence, that the Pontiac G6 and the Jaguar sedan are not subject to forfeiture to the state of Ohio. Accordingly, on June 28, 2017, the trial court issued a journal entry ordering the Euclid Police Department to "return to the rightful owner the Pontiac G6 and the Jaguar seized in connection with this matter."

{¶64} At the sentencing hearing, defense counsel notified the trial court that the owners of the subject vehicles were unable to access their property until they paid outstanding storage fees in the amount of $3,000. Defense counsel requested the trial court to waive the storage fees in the interest of fairness. The state opposed the request, arguing that Lavette lacked standing to raise arguments on behalf of the third-party property owner. The state suggested

that the appropriate action would be for the property owner to file a civil lawsuit. Ultimately, the trial court denied the request to waive the storage costs associated with each vehicle.

{¶65} Pursuant to R.C. 2981.11(A)(1), any property that has been lawfully seized or forfeited and that is in the custody of a law enforcement agency shall be kept safely by the agency, pending the time it no longer is needed as evidence or for another lawful purpose. It appears that the proper procedures were followed in this case and that the police department kept the vehicles safe until the court ordered their release. However, relevant to the issue raised on appeal, the forfeiture statutes are silent as to who is required to pay the storage fees incurred as a result of the seizure and storage of the property when the property is released.

{¶66} We recognize there is precedent establishing that a trial court has discretion to order the police department to pay storage fees pursuant to R.C. 2981.11 when the state requested forfeiture of a vehicle that belongs to an innocent third-party who was not the criminal defendant. *See Dayton Police Dept. v. Grigsby*, 2d Dist. Montgomery No. 23362, 2010-Ohio-2504; *Dayton Police Dept. v. Thomas*, 2d Dist. Montgomery No. 23289, 2010-Ohio-1506; *Dayton Police Dept. v. Pitts*, 2d Dist. Montgomery No. 23213, 2010-Ohio-1505. Those cases explained that "there [is] sound legal reasons for holding the police department, rather than the innocent, non-defendant owner of the impounded vehicle, responsible for the towing and storage fees." *Grigsby* at ¶ 18.

{¶67} In this case, however, neither Lavette nor the Euclid Police Department were ordered to pay the storage fees. Thus, unlike the circumstances presented in *Grigsby*, *Thomas*, and *Pitts,* the aggrieved party in this case is not a party to the underlying case or the current appeal. Under such circumstances, Lavette "lacks standing to * * * contest storage fees related to a third party." *State v. Travis*, 3d Dist. Seneca No. 13-17-13, 2017-Ohio-7285, ¶ 16, citing

*State v. Heintz*, 9th Dist. Lorain No. 02CA007997, 2003-Ohio-242, ¶ 9 ("If the items are in fact the property of [someone other than the appellant], appellant is not an aggrieved party whose rights have been adversely affected, and, as such, appellant lacks standing to appeal in this matter.").

{¶68} In the absence of statutory guidance, we are unable to conclude the trial court abused its discretion by denying Lavette's request to waive storage fees on behalf of the third-party property owner. Furthermore, because the trial court issued an order that mandated the return of the challenged property, we find no due process violation.

{¶69} Lavette's fourth assignment of error is overruled.

### E. R.C. 2929.11(B)

{¶70} In his fifth assignment of error, Lavette argues his sentence was excessive and unconstitutionally disparate to the sentence received by his more culpable codefendant.

{¶71} When reviewing felony sentences, we apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231. R.C. 2953.08(G)(2) specifies that an appellate court may increase, reduce, modify, or vacate and remand a challenged felony sentence if the court clearly and convincingly finds either that the record does not support the sentencing court's findings or the sentence is otherwise "contrary to law."

{¶72} "A sentence is not clearly and convincingly contrary to law 'where the trial court considers the purposes and principles of sentencing under R.C. 2929.11 as well as the seriousness and recidivism factors listed in R.C. 2929.12, properly applies post-release control, and sentences a defendant within the permissible statutory range.'" *State v. Baker*, 8th Dist.

Cuyahoga No. 106716, 2018-Ohio-4027, ¶ 12, quoting *State v. A.H.*, 8th Dist. Cuyahoga No. 98622, 2013-Ohio-2525, ¶ 10.

**{¶73}** In this case, Lavette was sentenced to an aggregate prison term of 24 years for his participation in three separate robberies. On appeal, Lavette contends that his sentence is excessive and inconsistent where his more culpable codefendant "was only sentenced to 20 years." Lavette maintains that while he "largely remained in or near the getaway vehicle," Everette (1) committed four additional robberies, (2) brandished a weapon, and (3) deliberately terrorized the victims so that they would comply with his demands.

**{¶74}** Lavette's claim is predicated on former[4] R.C. 2929.11(B), which provides:

A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

**{¶75}** Regarding consistency in sentencing among codefendants, this court has stated:

The courts have not interpreted the notion of consistency to mean equal punishment for codefendants. *State v. Harder*, 8th Dist. Cuyahoga No. 98409, 2013-Ohio-580, ¶ 7. Consistency is not synonymous with uniformity. *State v. Black*, 8th Dist. Cuyahoga No. 100114, 2014-Ohio-2976, ¶ 12. Rather, the consistency requirement is satisfied when a trial court properly considers the statutory sentencing factors and principles. *State v. O'Keefe*, 10th Dist. Franklin Nos. 08AP-724, 08AP-725, and 08AP-726, 2009-Ohio-1563, ¶ 41. "'[C]onsistency is achieved by weighing the factors enumerated in R.C. 2929.11 and 2929.12 and applying them to the facts of each particular case.'" *State v. Wells*, 8th Dist. Cuyahoga No. 100365, 2014-Ohio-3032, ¶ 12, quoting *State v. Lababidi*, 8th Dist. Cuyahoga No. 100242, 2014-Ohio-2267, ¶ 16. Consistency "'requires a trial court to weigh the same factors for each defendant, which will ultimately result in an outcome that is rational and predictable.'" *State v. Georgakopoulos*, 8th Dist. Cuyahoga No. 81934, 2003-Ohio-4341, ¶ 26, quoting *State v. Quine*, 9th Dist. Summit No. 20968, 2002-Ohio-6987, ¶ 12.

---

[4] On October 29, 2018, R.C. 2929.11(B) was amended by S.B. 66.

> "Consistency accepts divergence within a range of sentences and takes into consideration the trial court's discretion to weigh statutory factors." *State v. Hyland*, 12th Dist. Butler No. CA2005-05-103, 2006-Ohio-339. *See also State v. Switzer*, 8th Dist. Cuyahoga No. 102175, 2015-Ohio-2954; *State v. Armstrong*, 2d Dist. Champaign No. 2015-CA-31, 2016-Ohio-5263; *State v. Murphy*, 10th Dist. Franklin No. 12AP-952, 2013-Ohio-5599, ¶ 14. "Although the offenses may be similar, distinguishing factors may justify dissimilar treatment." *State v. Dawson*, 8th Dist. Cuyahoga No. 86417, 2006-Ohio-1083, ¶ 31.

*State v. Cargill*, 8th Dist. Cuyahoga No. 103902, 2016-Ohio-5932, ¶ 11-12. Thus, the fact that Lavette was sentenced to an aggregate prison term that was greater than the sentence Everette received does not in itself establish a violation of the consistency requirement set forth in R.C. 2929.11(B).

{¶76} Applying the foregoing to the circumstances of this case, we cannot say that the trial court violated R.C. 2929.11(B) by imposing a 24-year prison term. Lavette's individual sentences were imposed within the applicable statutory ranges and, when appropriate, the court complied with R.C. 2929.14(C)(4) when imposing consecutive sentences. Moreover, the record reflects that the court properly considered the statutory sentencing factors and principles, weighed them, and applied them accordingly. Contrary to Lavette's position, R.C. 2929.11(B) does not create a requirement that similarly situated offenders receive sentences equal to another offender's sentence or in lockstep with the defendant's own sense of culpability as it related to a codefendant. *See State v. Pruitt*, 8th Dist. Cuyahoga No. 98080, 2012-Ohio-5418, ¶ 26. Nor does it require a court to singularly review a codefendant's sentence imposed upon a plea deal to determine consistency. As this court has explained:

> When codefendants accept plea bargains for reduced charges in exchange for agreeing to testify against a codefendant, they are no longer "similar" offenders for purposes of R.C. 2929.11(B). Sentences given to codefendants under those circumstances are incomparable, so the court had no obligation to sentence [the appellant] similarly to his codefendants.

*State v. Thompson*, 8th Dist. Cuyahoga No. 99628, 2014-Ohio-202, ¶ 26.

**{¶77}** Given the nature of Everette's plea agreement with the state, we find the dissimilarity in sentences between Lavette and his codefendant was justified by distinguishing factors. Everette was sentenced to an agreed-upon sentence and had certain counts nolled in exchange for his testimony against Lavette. Given the "incomparable" circumstances of Lavette and Everette, we find the trial court did not act clearly and convincingly contrary to law by imposing a greater sentence on Lavette.

**{¶78}** Lavette's fifth assignment of error is overruled.

**{¶79}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

EILEEN T. GALLAGHER, JUDGE

MARY EILEEN KILBANE, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR