[Cite as *State v. Johnson*, 2019-Ohio-2913.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                     :

    Plaintiff-Appellee,          :

                                No. 107427

    v.                                 :

MERLIN T. JOHNSON,                 :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** July 18, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-622972-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Maxwell Martin and Lindsay Raskin, Assistant Prosecuting Attorneys, *for appellee.*

Paul W. Flowers Co., L.P.A., Louis E. Grube, *for appellant.*

PATRICIA ANN BLACKMON, J.:

{¶ 1}   Merlin T. Johnson ("Johnson") appeals from his convictions for aggravated murder, aggravated robbery, and other offenses.   He assigns the following errors for our review:

I.      The trial court erred by failing to grant the motion for judgment of acquittal because the state of Ohio elicited insufficient evidence to sustain a guilty verdict.

II.      The trial court's verdict is against the manifest weight of the evidence.

III.      The trial court committed plain error by failing to merge all convictions at sentencing.

IV.      [Johnson's] counsel was ineffective by stipulating that only counts one and two were allied offenses and by failing to argue that [Johnson's] convictions for complicity should have merged.

{¶ 2}   Having reviewed the record and pertinent law, we affirm Johnson's convictions, but we conclude that Johnson's conviction for felonious assault must merge with his conviction for aggravated murder.  We reverse this portion of the sentence and remand for resentencing, solely as to these offenses after the state elects upon which count to proceed.  The apposite facts follow.

{¶ 3}   In November 2017, Johnson, Eric Wilson ("Wilson"), and Latifah Stewart ("Stewart") were indicted in a nine-count indictment in connection with the shooting death of Jonathan Singletary.  As is relevant, Johnson was charged with aggravated murder, murder, deadly weapon, felonious assault, aggravated robbery, discharging a firearm near prohibited premises, tampering with evidence, and having a weapon while under disability.  The indictment also included various specifications including one-year, three-year, and 54-month firearm specifications

stemming from prior convictions for robbery with one-year firearm specifications (one of which involved Wilson). The case proceeded to a bench trial on April 30, 2018.

{¶ 4} Isis Dalton ("Dalton") testified that in 2017, she was living with Johnson, Wilson, and Stewart. Johnson did not have a car or cell phone. He would generally drive her to her job at Superior Academy, then use her car throughout the day. On October 25, 2017, Johnson picked Dalton up after work around 7:00 p.m. with Wilson and Stewart in the car, and the group returned to Dalton's apartment. The group ordered pizza, and around 8:00 p.m., Johnson borrowed Dalton's car and phone before leaving with Wilson to buy marijuana. Johnson returned without Wilson after midnight. He woke Dalton and Stewart and instructed them to falsely tell anyone asking about his whereabouts that he had been there with them all evening. According to Dalton, Johnson stated that he and Wilson were "going to get some weed, and I guess that [Wilson] decided to rob the guy, but the guy had a gun, so [Wilson] shot the guy and ran." Johnson told Dalton that he used her phone to set up the drug purchase then "tossed" it after the shooting. He instructed Dalton to falsely state that she lost the phone at Talica Green's ("Green") house on a street near the shooting.

{¶ 5} The next morning, Dalton's sister told her that the police were at their mother's house and wanted to talk to Dalton about a murder. Dalton testified that she did not want to include Green in the false statement to police so she decided to tell the investigating officers that she lost her phone at a store. Dalton decided to

cooperate with police after they placed her in a holding cell. However, she testified that she provided the police with a truthful statement. On cross-examination, Dalton stated that she never knew Johnson to have a weapon.

{¶ 6} Green testified that she works with Dalton at Superior Academy, and they are best friends. She stated that Johnson picked Dalton up after work on October 25, 2017. Later that night, Green telephoned Dalton about her evaluation for her child development certification that was to take place the next day. Dalton did not appear for work that day, however, and did not answer her phone. Dalton's mother called Green's phone several times, but did not answer when Green called back.

{¶ 7} Green further testified that Johnson called her and asked to meet. He was jittery and gave her "a rundown of a story — if anybody asks you." Johnson directed Green to falsely say that she, Dalton, Johnson, Wilson, and Stewart left Superior Academy at 7:40 p.m. on October 25, 2017, and went to Dalton's house. Then they "were smoking weed and * * * drinking. After that, [they] went and got pizza, * * * went to the gas station [and] back to [Dalton's] house." Later that night, Johnson called Green and asked if she had spoken with Dalton yet. Green indicated that she had not, but she conveyed Dalton's mother's instructions that Johnson returned Dalton's car. By the time Green met up with Johnson later to obtain the vehicle, she had become suspicious and asked him if he had killed or robbed someone. He responded that she would have to ask Dalton about that.

{¶ 8} The police contacted Green after obtaining her phone number from Dalton's phone. She stated that she was not initially truthful during her interview with the police, but decided to tell the truth about her discussions with Johnson after learning that a homicide had occurred.

{¶ 9} East Cleveland Police Officers John Hartman ("Officer Hartman") and John Portis ("Officer Portis") testified that they responded to a call regarding a male slumped behind the steering wheel of a vehicle at Manhattan and Orinoco Avenues. The vehicle was still in gear and the engine was running. The front driver's side window was rolled down. An unresponsive male, later identified as Singletary, was in the driver's seat and appeared to have been shot in the chest. The officers called an ambulance for the male and set up a perimeter around the vehicle. They observed a bullet hole in the driver's side door, and a grocery store bag containing marijuana and a loaded black .40 caliber Ruger firearm on the floor of the vehicle. One street over, the officers found a spent shell casing from a 9 mm weapon, a live round from a .40 mm weapon and a cell phone. Two more shell casings were also found nearby.

{¶ 10} East Cleveland Police Detective Kenneth Lundy ("Det. Lundy") testified that he obtained records from Singletary's phone and learned that he received a call from Dalton's phone at 12:02 a.m., on October 26, 2017, and another about a minute later. Two minutes after that, Singletary called Dalton's phone, and he called it again about a minute later. At 12:08 a.m., Dalton's phone called

Singletary two more times with the final call lasting for about six minutes. The call for assistance came in at 12:15 a.m.

{¶ 11} Det. Lundy interviewed Johnson twice. During the first recorded interview, Johnson stated that he was at Dalton's apartment with Wilson and Stewart on the evening of the shooting. At around 11:00 p.m., he and Wilson drove to a location off Euclid to meet two other women, but the women were not home. They drove to "DJ's house" in East Cleveland. After that, Wilson left alone in Dalton's car and with Dalton's phone. Johnson did not provide a last name or phone number for DJ. Johnson stated that Wilson returned with marijuana and cigars. Later, Wilson asked to use the car and phone for a second time to purchase more marijuana. According to Johnson's statement, Wilson was sweating profusely when he returned for the second time, and told Johnson that men shot at him during the drug deal so they had to leave the area. They drove back to Dalton's apartment, and Johnson told Dalton he lost her phone. He denied seeing Wilson with a gun that day.

{¶ 12} Later during this statement, Johnson indicated that after attempting to meet the two women, he drove to his sister's house. On the way, he learned that a man had been shot. Johnson also explained that as Wilson was about to rob the drug dealer, "two men came out of the cut" with guns and began firing. The drug dealer was armed too, and Wilson shot at the dealer as he fled. Wilson dropped the phone and returned to Dalton's house.

{¶ 13} During a second statement, Johnson maintained that after he and Wilson went to his sister's house, Wilson left alone to meet the drug dealer. Johnson stayed behind, but he heard gunshots and ran outside. Wilson said someone shot at him and told Johnson that they had to leave the area. Johnson's sister said they could not stay there. At that point, Wilson left alone.

{¶ 14} Johnson eventually told Det. Lundy that he and Wilson met Singletary earlier in the day at a gas station in East Cleveland. They bought marijuana from him and exchanged phone numbers. Later that night, they drove to Johnson's sister's house and called Singletary again about buying more marijuana. Johnson admitted that he and Wilson left Johnson's sister's house together to meet up with Singletary who was nearby around midnight. Johnson exited his sister's house and was on the sidewalk, while Wilson walked to Singletary's location. Johnson stated that he heard a gunshot, and a flash seemed to come from inside Singletary's car. He saw Wilson turn around and shoot back at Singletary, then he dropped Dalton's phone. Johnson and Wilson were together the following day, but Johnson fled on foot when Wilson was arrested. Johnson denied telling Dalton or Green to lie about his whereabouts.

{¶ 15} Deputy Medical Examiner Dr. Erica Armstrong testified that Singletary died from a gunshot wound to the chest that perforated his intestines and spleen. The wound had stippling but no fouling as is indicative of a distance of two to three feet away from the weapon during firing.

{¶ 16} Johnson did not present testimony but his defense was that he did not plan the attack on Singletary and was not present at the scene of the shooting. The trial court convicted Johnson of all charges. The court merged the aggravated murder conviction (Count 1) and the murder conviction (Count 2), and the state elected sentencing on aggravated murder. The court imposed a sentence of 25 years to life, with concurrent prison terms for the remaining offenses, and consecutive gun specifications, for a total term of 34 years to life.

## Denial of Motion for Acquittal

{¶ 17} In the first assigned error, Johnson argues that the trial court erroneously convicted him of aggravated murder, felonious assault, aggravated robbery, discharge of a weapon near prohibited premises, and having a weapon while under disability (Counts 1-4, 6 and 7) applying an accomplice liability theory that was entirely based upon the use of Dalton's phone and his mere presence "during a shooting at a planned drug deal."

{¶ 18} Crim.R. 29(A), which governs motions for acquittal, states:

> The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.

{¶ 19} Pursuant to Crim.R 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been

proved beyond a reasonable doubt. *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus.

{¶ 20} In *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus, the Ohio Supreme Court held:

> To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

{¶ 21} The state may demonstrate that an accused is guilty of aiding and abetting by direct or circumstantial evidence. *State v. Mendoza*, 137 Ohio App.3d 336, 342, 2000-Ohio-1689, 738 N.E.2d 822 (3d Dist.). The "mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). However, "'[p]articipation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed.'" *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981), quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). *See also State v. Copeland*, 8th Dist. Cuyahoga No. 106988, 2019-Ohio-1370, ¶ 42.

{¶ 22} In *State v. Capp*, 8th Dist. Cuyahoga No. 102919, 2016-Ohio-295, this court stated:

The complicity statute requires that an accomplice be treated as though he was the person who committed every act of the underlying principal offense. *State v. Kimble*, 7th Dist. Mahoning No. 06 MA 190, 2008-Ohio-1539, ¶ 27. "'In other words, the court can impute the elements of the principal offense, committed by the principal, to the aider and abettor.'" *Id.*, quoting *State v. Jackson*, 90 Ohio App.3d 702, 705, 630 N.E.2d 414 (6th Dist.1993); *State v. Hurse*, 10th Dist. Franklin No. 14AP-687, 2015-Ohio-2656, ¶ 11.

* * *

If complicity is proven, a defendant is subject to a sentencing enhancement on a firearm specification regardless of whether he was the principal offender or an unarmed accomplice. *State v. Chapman*, 21 Ohio St.3d 41, 42-43, 487 N.E.2d 566 (1986); [*State v.*] *Howard*[, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459] at ¶ 24 ("It is well settled that an unarmed accomplice can be convicted of an underlying felony, together with a firearm specification, based on an aider and abettor status."), quoting *State v. Porch*, 8th Dist. Cuyahoga No. 65348, 1994 Ohio App. LEXIS 1936, *11 (May 5,1994). "In such a case, the actions of the principal are imputed to the accomplice, and the accomplice may be found to have committed every element of the offense committed by the principal, including possession of the weapon." *State v. Humphries*, 8th Dist. Cuyahoga No. 99924, 2014-Ohio-1230, ¶ 18, citing *State v. Frost*, 164 Ohio App.3d 61, 2005-Ohio-5510, 841 N.E.2d 336 (2d Dist.), and *State v. Alexander*, 8th Dist. Cuyahoga No. 98941, 2013-Ohio-2533; *State v. Noor*, 10th Dist. Franklin No. 13AP-165, 2014-Ohio-3397, ¶ 51, fn. 2 ("A firearm specification is not a separate offense but, rather, a sentencing provision that enhances the penalty for the associated predicate offense.").

*Id.* at ¶ 24, 27. *Accord Howard* (although there was no evidence that Howard was an actual shooter, conviction for felonious assault and other offenses was affirmed in light of Howard's conduct before and after the offenses, including evidence that he was the "instigator of the shooting" and gave a false alibi to police).

{¶ 23} Here, although the trial court could not conclude beyond a reasonable doubt that "Johnson himself used the gun to facilitate" the offenses, the court did

find him guilty as an aider and abettor. The court cogently explained the "essence of the evidence" as follows:

> Johnson had the cell phone used to communicate with Singletary and get him to come to the area of Savannah and Orinoco, near Johnson's sister's house; Johnson fled from the crime scene; he admitted the robbery to Dalton; he made great efforts to manufacture cover story; he evaded arrest and, once arrested, gave divergent explanations for what happened. These all suggest his active participation and consciousness of guilt, either as principal or an accomplice.

{¶ 24} The state's evidence in this matter demonstrates that Johnson was more than merely present. He admitted to meeting Singletary earlier on the date of the shooting. The record also indicates that Johnson borrowed Dalton's car and phone, and that numerous calls were placed to Singletary from that phone. The last call was placed from Dalton's phone to Singletary at 12:08 a.m., and police received the 911 call related to the shooting at 12:15 a.m. Johnson initially denied being present then repeatedly provided shifting information to police. He initially claimed that he was with a person named D.J., and that Wilson left with Dalton's car and phone. Eventually, however, he stated that he and Wilson went to the sister's house and called Singletary to purchase drugs. He admitted that he went with Wilson to meet Singletary on the street. He stated that he observed the shooting, and he admitted that he and Wilson fled to the sister's house. Johnson told Dalton that he "tossed" the phone after the shooting and he fabricated a false alibi for her to relay to anyone who asked. He also instructed Green to give false information regarding his whereabouts on the night of the shooting. The day after the shooting, Johnson still had Dalton's car and spent the day with Wilson. Green found Johnson's

behavior so suspicious that she asked him if he had killed someone. He responded by telling her to ask Dalton. Johnson fled as Wilson was stopped by police. Based on the foregoing, the evidence established that Johnson was more than a mere bystander, and that he supported, assisted, and cooperated with Wilson and there is strong circumstantial evidence that he shared Wilson's intent.

{¶ 25} Accordingly, the state presented sufficient evidence to show Johnson's guilt. The first assigned error is without merit.

## Manifest Weight of the Evidence

{¶ 26} In the second assigned error, Johnson argues that his convictions are against the manifest weight of the evidence. He maintains that the evidence strongly suggests that he did not make the phone calls for the drug purchase, he was not present at the shooting, had no advance knowledge of the robbery, and did not dispose of the phone.

{¶ 27} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the

evidence and ordering a new trial is reserved for only those "exceptional cases in which the evidence weighs heavily against the conviction." *Id.*

{¶ 28} Moreover, circumstantial evidence carries the same weight as direct evidence. *State v. Seals*, 8th Dist. Cuyahoga No. 101081, 2015-Ohio-517, ¶ 32, citing *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492 (1991).

{¶ 29} In this matter, despite Johnson's claims, the manifest weight of the evidence indicates that Johnson borrowed Dalton's phone on the night of the shooting. After giving shifting accounts of what happened, he admitted to going with Wilson to the area of the shooting. The phone Johnson borrowed from Dalton was used to repeatedly communicate with Singletary in the final minutes before the shooting. Johnson told Dalton that he tossed the phone after Wilson shot Singletary. Johnson then contacted Dalton and Green about falsely stating that he was with them at the time of the shooting. He spent the day after the shooting with Wilson, and fled when police arrested Wilson. The state's case, though demonstrated through both circumstantial and direct evidence, was not against the manifest weight of the evidence. When considering the credibility of the witnesses and resolving the conflicts in the evidence, we cannot conclude that this case is one of the "exceptional cases in which the evidence weighs heavily against the conviction."

{¶ 30} Accordingly, the second assignment of error is without merit.

## Allied Offenses

{¶ 31} Johnson next argues that his convictions under Counts 1-4, 6, and 7 are allied offenses because they are all premised upon the same conduct, i.e. the telephone call from Dalton's phone to Singletary for the purported purpose of luring him to the scene where he was shot.

{¶ 32} Because this issue was not raised below, we review for plain error affecting Johnson's substantial rights. Crim.R. 52(B); *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3.

{¶ 33} Pursuant to R.C. 2941.25(A), "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, * * * the defendant may be convicted of only one."

{¶ 34} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 30-31, the Ohio Supreme Court detailed the allied offenses analysis:

> A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses (1) the offenses are dissimilar in import or significance — in other words, each offense caused separate, identifiable harm; (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation.
>
> At its heart, the allied offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the

harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

*Id.* at ¶ 25-26.

{¶ 35} On the issue of whether offenses were committed with the same animus, this court has explained that "animus" means "purpose or, more properly, immediate motive." *State v. Bailey*, 8th Dist. Cuyahoga No. 100993, 2014-Ohio-4684, ¶ 34, quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). Animus may be inferred from the surrounding circumstances. *Id.* When "an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, a priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime." *Id.*, quoting *Logan*. Therefore, in determining whether the offenses share the same animus, the court must consider:

> (1) whether the first offense was merely incidental to the second offense or whether the defendant's conduct in the first offense demonstrated a significance independent of the second, and (2) whether the defendant's conduct in the first offense subjected the victim to a substantial increase in the risk of harm apart from that involved in the second offense.

*Id.* at 35, citing *State v. Shields*, 1st Dist. Hamilton No. C-100362, 2011-Ohio-1912.

{¶ 36} We note that under R.C. 2923.03(F), an accomplice to a crime shall be prosecuted and punished as if she were a principal offender. In determining the issue of merger in connection with accomplice liability, the court must consider

whether the defendant aided and abetted each offense with separate and distinct acts resulting in separate and identifiable harms. *State v. Harless*, 5th Dist. Ashland No. 14-COA-034, 2015-Ohio-4753. Moreover, aggravated robbery and murder do not merge when the force used to effectuate an aggravated robbery is far in excess of that required to complete the robbery, or where the circumstances suggest that a separate intent to kill existed. *See State v. Stinson*, 2d Dist. Montgomery No. 26449, 2015-Ohio-4405, ¶ 77.

{¶ 37} Here, Johnson argues that the state relied upon the same conduct in order to establish aggravated murder, felonious assault, aggravated robbery, discharge of a firearm near prohibited premises, and having a weapon under disability, i.e., the telephone call from Dalton's phone to Singletary for the purported purpose of luring him to the scene where he was shot. However, the state's evidence in this matter demonstrates that Johnson did not simply make a phone call. Rather, the evidence demonstrated that he aided and abetted from the beginning to end in conduct that resulted in commission of distinct offenses with a separate animus to each. *State v. Burt*, 8th Dist. Cuyahoga No. 99097, 2013-Ohio-3525, ¶ 32. However, we hasten to add that immediately finding Johnson guilty of aggravated murder and murder, the trial court also found Johnson guilty of felonious assault, noting that "the elements of felonious assault were complete once the gun was fired and before the bullet struck Singletary, and Singletary's death was a result of the same conduct." *State v. Johnson*, Cuyahoga C.P. No. CR-17-622972 (May 30, 2018). With that finding in mind, we conclude that the offenses were committed with the same

conduct and same animus so they are allied offenses of similar import. Although the trial court merged the aggravated murder and murder convictions, further merger is required on the aggravated murder and felonious assault convictions.

{¶ 38} This assigned error is well taken in part.

## Ineffective Assistance of Counsel

{¶ 39} Johnson next claims that his trial attorney was ineffective for stipulating that only Counts 1 (aggravated murder) and 2 (murder) were allied.

{¶ 40} The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel. Courts employ a two-step process to determine whether the right to effective assistance of counsel has been violated. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were as serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.*

{¶ 41} In this matter, we have determined that the felonious assault conviction must be merged with the aggravated murder conviction, so this aspect of the assigned error is moot. We have further determined that the remaining offenses are not allied. Accordingly, this assigned error is without merit.

{¶ 42} Convictions are affirmed, the sentences imposed for the aggravated murder and felonious assault counts are reversed, and the matter is remanded for resentencing on whichever of those two counts survives the state's election.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE

EILEEN T. GALLAGHER, P.J., CONCURS WITH SEPARATE OPINION;
MARY J. BOYLE, J., CONCURS IN JUDGMENT ONLY

EILEEN T. GALLAGHER, P.J., CONCURRING:

{¶ 43} I concur with the lead opinion and its determination that the state presented sufficient and credible evidence to support appellant's convictions. I write separately only to reference the circumstances of this case that give me pause.

{¶ 44} In this case, the state argued that appellant's complicity was established by evidence that he (1) set up the drug deal, (2) admitted he was present

at the scene of the drug deal, then subsequently (3) fled the scene, (4) threw Dalton's phone in the street, (5) fabricated an alibi, and (6) lied to the police.

{¶ 45} Unquestionably, the state presented sufficient evidence that appellant made the phone call to set up an apparent drug deal with the victim and that he was present at the scene of the shooting. However, in my view, all this evidence established is that appellant attempted to purchase drugs and was present at the scene when an altercation occurred between his codefendant and the victim. In order to establish the criminality of appellant's conduct, the state was forced to rely on certain actions appellant took after the shooting.

{¶ 46} For these reasons, I do not believe appellant's presence at the scene and evidence that he contacted the victim to schedule a drug deal, *standing alone*, constituted sufficient evidence of complicity to commit the aggravated robbery underlying the aggravated murder offense. However, upon consideration of appellant's conduct before and during the incident in light of the actions he took after the incident, I must concede that, collectively, there was circumstantial evidence to support appellant's convictions. Regarding this issue, this court has routinely held that:

> Aiding and abetting may be shown by both direct and circumstantial evidence and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout. *Id.* at 150, 444 N.E.2d 68.

*State v. Langford,* 8th Dist. Cuyahoga No. 83301, 2004-Ohio-3733, ¶ 21. Applying this standard, a reasonable trier of fact could conclude that appellant's participation in the criminal acts could be inferred from his presence at the scene and the actions he took after the offenses were committed. Based on the unambiguous precedent of this court, I find there was sufficient and credible circumstantial evidence of appellant's guilt.

{¶ 47} However, I find it necessary to express my belief that the reliance on circumstantial evidence that involves actions a defendant took after an incident in order to prove the criminality of his conduct during the incident, is a slippery slope that could result in the over prosecution of alleged aiders and abettors. As stated, the evidence of appellant's actions after the incident in this case could be reasonably construed as creating an inference that appellant participated in the criminal scheme and contacted the victim with the intent to complete the underlying aggravated robbery. With that said, I equally believe that a reasonable person could also conclude that appellant was merely present at a planned drug deal that suddenly turned wrong, and that the actions he took after the incident could equally reflect the actions of a person who was scared, leery of the police, and unwilling to "snitch" on his friend. Thus, a 24 year old man is now required to spend 34 years-to-life in prison based upon judicial precedent that infers an individual's criminal intent based on lies and actions he or she made after a shooting.